## S98P0476. MIZE v. THE STATE.
(501 SE2d 219)

BENHAM, Chief Justice.

A jury convicted William Mark Mize of malice murder in the shooting death of Eddie Tucker. The jury recommended a death sentence after finding two statutory aggravating circumstances: 1) that Mize caused or directed another to commit the murder and 2) that the murder was outrageously or wantonly vile, horrible or inhuman in that it involved an aggravated battery to the victim. OCGA § 17-10-30 (b) (6), (7).[1] We affirm.

Viewed in the light most favorable to the verdict, the evidence adduced at trial showed that Mize was the leader of a small group, similar to the Ku Klux Klan, called the National Vastilian Aryan Party (NVAP). Witnesses testified that Mize made all the decisions for the NVAP. Several witnesses also testified that Mize displayed a single-shot 12-gauge shotgun at an NVAP meeting and told the members that the shotgun was the kind of weapon that the group would use because it could not be traced. Several of Mize's friends and co-workers were members of the NVAP, or in the initiation process. Eddie Tucker, the victim, had filled out an application form but was not a full member.

On Saturday, October 15, 1994, several NVAP members and applicants gathered at Mize's home after Mize got off from work. Those present were Mize, Mark Allen, Chris Hattrup, Brian Dove, Samantha Doster (Mize's girl friend), and Tucker. Mize told Doster that the group was going camping that night and they all got in Mize's car. When they were driving, Mize told the group that there was a crack house in Athens that he wanted "gotten rid of." Mize stated that he wanted Hattrup and Tucker to set the house on fire, and they stopped at a convenience store and bought a can of lighter fluid. Hattrup and Tucker were dropped off near the house but their attempt to set it on fire was unsuccessful. When they rejoined the group, Hattrup told Mize that he needed to talk with him. Hattrup

---

[1] The crime occurred on October 15 or 16, 1994. Mize was indicted by the Oconee County Grand Jury on January 11, 1995, for malice murder. The State filed a notice of intent to seek the death penalty on March 29, 1995, and Mize was tried before a jury from December 4-13, 1995, convicted and sentenced to death. Mize filed a motion for new trial on January 4, 1996, and an amended motion for new trial on May 20, 1996. After a hearing, the amended motion for new trial was denied on August 22, 1996. Mize appealed to this Court, but his original trial counsel withdrew from the case. We remanded to the trial court on November 22, 1996, to consider appointment of new counsel issues. New counsel was appointed on January 30, 1997. A motion for new trial following remand was filed on March 3, 1997, amended on June 30, 1997, and supplemented on August 4, 1997. The amended motion for new trial following remand was denied on October 2, 1997, and a second notice of appeal was filed on October 31, 1997. This case was docketed on December 10, 1997, and orally argued on March 9, 1998.

also said, referring to Tucker, that they "didn't need anybody around that couldn't follow orders."

After spending an hour at a bar, Mize drove the group to a wooded area in Oconee County. Dove and Doster were given camping gear to carry and the group set out into the woods. No one had a flashlight even though it was night. Tucker was in the lead, followed by Mize, Allen, Doster, Dove and Hattrup. After they had gone only a short distance, Hattrup passed Dove and Doster and moved up the trail to talk with Allen and Mize. Mize told Allen to stop Dove and Doster from continuing into the woods. At this point, Tucker, Hattrup and Mize were out of sight in the woods ahead of Allen, Dove and Doster. There was a shot, and Tucker exclaimed, "My God, what did you do that for?" There was a second shot. Doster heard Hattrup ask Mize if he had the gun and Mize replied, "No, man. I thought you had it." Hattrup stated, "No. He took it away from me," and Mize said, "If you can't finish it I can." Allen left Dove and Doster and moved up the trail. Dove and Doster heard a discussion among Mize, Allen, and Hattrup about muscle spasms and how Tucker was still moving. There was a third shot.

Dove and Doster ran back to Mize's car. Mize emerged from the woods holding a shotgun and trying to break it down. Once in the car, Mize asked everyone if they knew why it was done. Everyone nodded in agreement. Mize told the group that the same thing could happen to them if they ran their mouth. Mize also told the group that, if asked about Tucker, they should say that they had dropped him off at a convenience store. While they were driving, Allen and Hattrup noticed that the barrel of the shotgun had shattered so they stopped at a bridge and threw the gun in a river. Later, Mize confided to Doster that he had finished Tucker off by shooting him in the head.

The police discovered Tucker's body several days later. He had been shot in the back, chest and head with a shotgun. The medical examiner testified that the back and chest wounds were inflicted by a shotgun fired at close range. The victim's head exhibited widely scattered pellet wounds that failed to penetrate the skull; the head wounds were consistent with a close-range shotgun blast that had shattered the barrel. The medical examiner further testified that the shots to the back and chest tore through the victim's right lung, but that none of the wounds were immediately fatal. The victim's death was due to blood loss, and it could have taken him several minutes to die. A fragment of the shotgun barrel was discovered about two feet from the body's location; the gun was not recovered.

After the body was discovered but before anyone was arrested, Chris Hattrup showed his roommate, Paul McDonald, the newspaper article about Tucker's death and told him what had happened. When the crack house failed to burn, Mize asked how Tucker had done and

Hattrup responded that Tucker "didn't do what he was supposed to do." Mize then said, "you know what we have to do." Hattrup admitted to McDonald that he shot Tucker in the back and chest, but that Tucker was still alive. He was out of ammunition, though, so he asked Mize for another shotgun shell and Mize gave it to him. Hattrup then shot Tucker in the head. Hattrup also boasted to McDonald that he was now a "hit man for the Klan."

Brian Dove told the police what he had seen and heard that night, and he later testified at Mize's trial. The other four NVAP members involved in Tucker's death were arrested. After spending a year in jail, Doster agreed to testify against the others and her charges were dropped.

1. The evidence summarized above was sufficient to authorize a rational trier of fact to find Mize guilty beyond a reasonable doubt of malice murder. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979). Contrary to Mize's assertion, there is evidence that he fired at least one of the shots. Even assuming that Mize did not fire any of the shots, there is sufficient evidence that he intentionally aided or abetted the commission of the murder, or that he intentionally advised, encouraged, or procured another to commit the murder. OCGA § 16-2-20 (b) (3), (4); *Chapman v. State*, 263 Ga. 393 (435 SE2d 202) (1993); *Gambrel v. State*, 260 Ga. 197 (391 SE2d 406) (1990).

2. Mize claims that the State withheld exculpatory information in violation of *Brady v. Maryland*, 373 U. S. 83 (83 SC 1194, 10 LE2d 215) (1963). Specifically, he asserts that the State had written notes from a pre-trial interview with Samantha Doster that contained exculpatory information not revealed to the defense, and that the State withheld the identity of a GBI intern who could have provided exculpatory information. Both contentions are without merit. First, the notes from the interview with Doster were not exculpatory. The notes were created after Doster agreed to testify for the State: a prosecutor spoke with her and jotted down about six pages of notes in bullet format. These notes contained the following information: Mize was the leader of the NVAP, Mize told Allen to stop Dove and Doster from going deeper into the woods, Mize returned to the car with the gun, Mize gave everyone a story to tell if anyone asked about Tucker, and Mize admitted to finishing off the victim. Mize claims that he could have impeached Doster with the notes because the notes imply that Mize fired the first two shots while Doster's trial testimony implied (based on the conversation between Hattrup and Mize in the woods) that Hattrup had fired the first two shots. In order to prevail on a *Brady* claim, Mize must show:

> that the State possessed evidence favorable to the defendant; the defendant did not possess the evidence nor could he

obtain it himself with any reasonable diligence; the prosecution suppressed the favorable evidence; and had the evidence been disclosed to the defense, a reasonable probability exists that the outcome of the proceeding would have been different.

*Burgeson v. State*, 267 Ga. 102 (2) (475 SE2d 580) (1996). The notes were not favorable to the defense because they unequivocally stated that Mize participated in Tucker's murder. In addition, Mize claims that the notes revealed that Doster had used drugs on the night of the murder and that this information could have been used to impeach her recollection of events. The notes, however, only state that Doster had used drugs on some night prior to the night of the murder, and Doster readily admitted her past drug abuse at trial. We find no *Brady* error with regard to the State's notes of the interview with Samantha Doster.[2]

The second contention, that the State withheld the identity of a GBI intern, is also not a *Brady* violation. Mize claims that the State should have given Mize the intern's identity because the intern had information that was exculpatory. When the body was discovered, the GBI attempted to sweep the vicinity of the body with a metal detector, but a GBI agent testified that the batteries died before they could complete the job. The agent also testified that a GBI intern was operating the metal detector at the scene. A month after the murder, the GBI returned to the murder scene with another metal detector and recovered a shotgun barrel fragment within two feet of the body's former location. At the hearing on the motion for new trial, Mize introduced an affidavit from Kevin Smith, the GBI intern, that stated that the batteries on the metal detector did not become low on the first crime scene search until after the area had been swept with the metal detector. Mize claims that the failure of the State to give the defense Kevin Smith's name prevented Mize from using Smith's information at trial to argue that the barrel fragment had been planted by the State. The name of the metal detector operator, though, is not by itself favorable to the defense. What Mize really contends is favorable to the defense is that the intern believed that the batteries had failed at a different time than the GBI agent supervising the crime scene. The record is clear that the State did not know this information before trial and therefore could not possess it and suppress it in violation of *Brady*. See *Burgeson*, supra. We find

---

[2] Mize did not elect to have OCGA § 17-16-1 et seq. apply to his case. We note, however, that the prosecutor's notes of his interview with Doster would not have been discoverable under OCGA § 17-16-7 because they were "notes or summaries made by counsel." OCGA § 17-16-1 (2) (C); *Forehand v. State*, 267 Ga. 254 (3) (477 SE2d 560) (1996).

no *Brady* violation with regard to the identity of the GBI intern.

3. Mize complains that the State introduced inflammatory, irrelevant evidence about Mize's racist beliefs and Ku Klux Klan affiliation in an attempt to prejudice the jury. At trial, several witnesses testified about the racist goals and beliefs of Mize and the NVAP. Photographs of items seized from Mize's home, such as flags bearing the NVAP or Klan insignia, a racist poster, a Klan belt buckle, and a cross with NVAP symbols, were admitted into evidence. Normally, evidence concerning a defendant's political or racial beliefs is irrelevant to a determination of guilt or innocence. OCGA § 24-2-2. Under the facts of this case, however, the evidence was admissible because it explained Mize's motive for the murder and his bent of mind. The evidence at trial showed that Mize, as leader of a small Klan-like organization, ordered and participated in Tucker's murder because Tucker had failed to follow Mize's orders to burn a crack house. " 'Evidence that is otherwise relevant and material to the issues in a criminal case does not become inadmissible simply because it incidentally puts a defendant's character or reputation into evidence.' " *Boutwell v. State*, 256 Ga. 63 (2) (344 SE2d 222) (1986), quoting *Daniels v. State*, 252 Ga. 30 (6) (310 SE2d 904) (1984); *Earnest v. State*, 262 Ga. 494 (1) (422 SE2d 188) (1992) (evidence of defendant's involvement in satanic cult admissible to show motive). The State had to present evidence of Mize's Klan affiliation and position within the NVAP in order to show his motive for the murder and his role in the killing.

4. Mize contends that the trial court erred by allowing Deputy William Ricketts to serve as a bailiff during Mize's trial. Mize claims that he needed to call Deputy Ricketts as a witness for impeachment purposes but could not do so because the deputy had formed a close relationship with the jury. Before trial, Mize moved to prevent any Oconee County deputies from serving as bailiffs during the trial. At a pre-trial hearing, Deputy Ricketts testified that his only role in the case was to provide security for a few hours on the road adjoining the crime scene. He never actually went into the woods to the crime scene, and was not involved in the investigation of the case. The State told the trial court that it did not intend to call Deputy Ricketts as a witness. The trial court ruled that Deputy Ricketts would serve as a bailiff because Deputy Ricketts was a certified EMT and the trial court wanted someone with medical training to be with the jury.

At trial, Investigator Ed Norman of the Oconee County Sheriff's Department testified that GBI Agent Cooper told him that the metal detector's batteries had died, but Investigator Norman's report stated that it was Deputy Ricketts who told him about the dead batteries. Mize claims that he needed to call Deputy Ricketts to impeach Investigator Norman, and that this dilemma should have resulted in a mistrial, which the trial court denied. We disagree with Mize's con-

tention. First, Investigator Norman could have been impeached with his own written report. Second, nothing prevented Mize from calling Deputy Ricketts for the purpose of impeaching Investigator Norman. Mize points to *Radford v. State*, 263 Ga. 47 (426 SE2d 868) (1993), and *Turner v. Louisiana,* 379 U. S. 466 (85 SC 546, 13 LE2d 424) (1965), to support his claim that Mize's conviction must be reversed due to his need to call a bailiff as a witness. These cases do not support his argument, though, because they each involved bailiffs who were called as key witnesses for the prosecution. For example, in *Radford*, supra, a bailiff was called by the State and he testified that he was the first officer to respond to the scene of the crime, that he obtained a description of the defendant and his car from the victim's sister, and that he subsequently staked out the defendant's residence and observed some suspicious behavior. *Radford*, supra at 48-49. In Mize's case, the bailiff was never called as a State witness, and his involvement in the case was extremely minor. In fact, the rationale behind reversing the convictions in *Radford* and *Turner*, that the jury would tend to favor a witness with whom they had formed a bailiff-juror relationship, would seem to work in Mize's favor were he to call Deputy Ricketts to impeach Investigator Norman. We conclude that Mize suffered no prejudice from Deputy Ricketts serving as a bailiff in this case.

5. Mize claims that the State failed to prove chain of custody for the fragment of shotgun barrel admitted into evidence. This contention is without merit. There is no need to prove chain of custody for non-fungible physical evidence identified by a witness, since these items can be recognized by observation. *Harper v. State*, 251 Ga. 183 (1) (304 SE2d 693) (1983); *Baker v. State*, 250 Ga. 671 (1) (300 SE2d 511) (1983).

6. Mize complains that several prospective jurors were improperly qualified to serve by the trial court.

(a) *Juror Hunsinger*. Mize claims that Juror Hunsinger knew several of the law enforcement witnesses on the State witness list and was biased in favor of the prosecution. She stated that she had gone to high school with two of the witnesses, and that she had met another State witness because of her son's traffic violations. But she also stated that she had never been close friends with any of the witnesses, and that she had had very little contact with them in the previous decade (she had talked with one of her high school friends four times in the past eleven years). Even though Juror Hunsinger stated that she would be "hard pressed" to believe that the State witnesses whom she knew would fabricate evidence, she repeatedly and firmly stated that she would judge the credibility of the witnesses and the guilt of the defendant based on the evidence and the trial court's instructions. Whether to strike a juror for cause lies within the sound

discretion of the trial court and the trial court did not abuse its discretion by denying the motion to strike Juror Hunsinger. *Brown v. State*, 268 Ga. 354 (3) (490 SE2d 75) (1997); *Foster v. State*, 248 Ga. 409 (3) (283 SE2d 873) (1981) (fact that juror has formed an opinion about the credibility of a witness does not mandate that the juror be excused for cause).

(b) *Jurors Miller and Cutler.* Mize claims that these jurors should have been struck for cause because they believed that the defense had a burden to produce evidence of Mize's innocence. It is apparent from the voir dire transcript that these jurors were confused about the State's burden to prove the defendant guilty beyond a reasonable doubt because they had not yet received any legal instruction from the trial court. When apprised that the State had the burden of proof and the defense did not need to produce any evidence, both jurors stated that they could adhere to this principle in their consideration of the case. The trial court did not abuse its discretion by refusing to strike these jurors for cause. *Brown*, supra.

(c) *Juror Hicks.* Mize did not move to strike Juror Hicks for cause, and the trial court did not err by failing to excuse her sua sponte. *Spencer v. State*, 260 Ga. 640 (1) (398 SE2d 179) (1990).

(d) *Juror Gibson.* Mize argues that Juror Gibson should have been excused for cause because he was predisposed to a death sentence. "The proper standard for determining the disqualification of a prospective juror based upon his views on capital punishment 'is whether the juror's views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." ' " *Greene v. State*, 268 Ga. 47, 48 (485 SE2d 741) (1997), quoting *Wainwright v. Witt*, 469 U. S. 412, 424 (105 SC 844, 83 LE2d 841) (1985). Juror Gibson indicated that he would be "leaning" toward imposing a death sentence if the evidence showed that the murder was intentionally planned. However, he also stated that he could fairly and honestly consider all three sentencing options. A prospective juror cannot be excused for cause merely because he states that he is leaning for or against a death sentence. *Greene*, supra at 53. Instead, the relevant inquiry on appeal is whether the trial court's qualification of the juror is supported by the record as a whole. See id. at 49. Viewing the record as a whole and giving deference to the trial court's decision, we conclude that the trial court did not err by finding that Juror Gibson's views on capital punishment would not substantially impair his duties as a juror in accordance with his instructions and his oath. Id. at 48-49.

(e) *Juror Rice.* Mize complains that Juror Rice should have been excused for cause because he had negative feelings about the Ku Klux Klan that prevented him from being impartial. During voir dire, Juror Rice stated that he had personal feelings against the Klan

and that he might not consider a member of the Klan to be as credible as another witness. Upon further questioning, Juror Rice stated that he had previously misstated and that he would not disbelieve someone just because they were in the Klan. He testified that he was against all kinds of hate groups, but that he would not apply his personal feelings when listening to the evidence. He further stated that Mize was presumed innocent and that he would follow the trial court's instructions. The trial court did not manifestly abuse its discretion by concluding that Juror Rice was able to lay aside his opinion concerning the Klan and render a verdict based on the evidence presented in court. See *Diaz v. State*, 262 Ga. 750 (2) (b) (425 SE2d 869) (1993); *Irvin v. Dowd*, 366 U. S. 717, 723 (81 SC 1639, 6 LE2d 751) (1961).

7. Mize complains that the trial court erred by allowing Samantha Doster to testify for the State even though the State failed to include Samantha Doster on its witness list. We disagree. A defendant has a constitutional and statutory right to a list of State witnesses before trial. Ga. Const., Art. I, Sec. I, Par. XIV; OCGA §§ 17-16-3; 17-16-8; USCR 30.3. While Doster was not included on the State's witness list, this omission does not require a reversal because the purpose of the rule was satisfied. The witness list rule is designed to prevent a defendant from being surprised at trial by a witness that the defendant has not had an opportunity to interview. *Ellis v. State*, 248 Ga. 414 (3) (283 SE2d 870) (1981). The record shows that more than a month before trial the State informed Mize that it was dropping the charges against Doster in exchange for her testimony against Mize. Mize was also provided with a copy of the nolle prosequi order which explicitly stated that the dismissal of charges against Doster was in exchange for her testimony against the other defendants. Further, Doster was Mize's co-indictee and "a defendant is placed on due notice that all parties named as victims or co-indictees in an indictment may be called as witnesses." *Byrd v. State*, 216 Ga. App. 510 (4) (455 SE2d 318) (1995). In addition, the trial court allowed Mize's attorney to interview Doster before her trial testimony, and billing records introduced at the motion for new trial hearing show that Mize's counsel prepared for his impeachment of Doster a week before the trial. We conclude that Mize can show no harm resulting from the failure of the State to include Doster on its list of witnesses.

8. Mize complains that the prosecutor injected extrinsic and prejudicial matters into the guilt/innocence closing argument that had no basis in the evidence. See *Bell v. State*, 263 Ga. 776 (439 SE2d 480) (1994). Specifically, Mize complains that the State compared him to Charles Manson and that it urged the jury to consider the "type of person" Mize was in reaching a verdict. Mize, however, failed to

object to any portion of the State's closing argument. "When no timely objection is interposed, the test for reversible error is not simply whether or not the argument is objectionable, or even if it might have contributed to the verdict; the test is whether the improper argument in reasonable probability changed the result of the trial." *Todd v. State*, 261 Ga. 766 (2) (a) (410 SE2d 725) (1991).

We find no error sufficient to overcome Mize's procedural default. The prosecutor's Manson analogy was used to illustrate Mize's control over the NVAP and his criminal liability from ordering Tucker's murder. "Analogizing a defendant or a defendant's case to a well-known defendant or case is permissible during argument if the analogy is supported by facts in evidence." *Carr v. State*, 267 Ga. 547 (7) (a) (480 SE2d 583) (1997). Compare *Bell*, supra (conviction reversed because prosecutor in drug trial closing argument referred to a well-known murder case and a rape case). In addition, when viewed in context, the "type of person" argument was used to rebut the defense assertion that Mize was just a bystander to the murder — i.e., that Mize was the undisputed leader of his group and that he had surrounded himself with followers willing to act on his order. Under these circumstances, this argument was not improper.

9. Mize complains that the State introduced irrelevant and prejudicial evidence. At trial, the State introduced a flag bearing a marijuana leaf and the slogan "this bud's for you" that was hanging in Mize and Doster's home when Mize was arrested there. Pretermitting the issue of admissibility, we conclude that any error would be harmless because Doster testified that the flag belonged to her and not to Mize.

10. Mize claims that the trial court erred by allowing the State to display a weapon in the courtroom that was not the murder weapon. The murder weapon was not recovered. During the direct examination of a State witness who testified that he had been at an NVAP meeting where Mize had brandished a single-shot 12-gauge shotgun, the State showed the witness a single-shot 12-gauge shotgun and asked him if it was similar to the weapon that Mize had displayed. This was not improper. "A weapon that was not actually used in the commission of an offense, but which is similar to that which was so used is generally admissible into evidence." *Boyd v. State*, 264 Ga. 490 (2) (448 SE2d 210) (1994). The State expressly stated that the shotgun in the courtroom was not the actual murder weapon, and previous witnesses had testified that a similar shotgun had been the murder weapon. Id. We find no error.

11. Mize's trial counsel was not ineffective under *Strickland v. Washington*, 466 U. S. 668 (104 SC 2052, 80 LE2d 1674) (1984). "In order to establish that trial counsel's performance was so defective as to require a new trial, [Mize] must show that counsel's performance

was deficient and that the deficient performance so prejudiced [Mize] that there is a reasonable likelihood that, absent counsel's errors, the outcome of the trial would have been different." *Roberts v. State*, 263 Ga. 807 (2) (439 SE2d 911) (1994). There is a strong presumption that counsel's conduct fell within a broad range of reasonable professional conduct. Id. The record reveals that Mize's counsel attempted to minimize Mize's involvement in the murder through evidence that Hattrup had fired all three shots, and counsel attempted to show that the police had not been thorough in their investigation. Mize's counsel's performance was not deficient because these are reasonable strategic decisions. See *Strickland*, supra at 690-691. It is also apparent from the record that trial counsel conducted an adequate investigation under the circumstances, considering their client's refusal to allow an investigation for mitigation evidence. See *Strickland*, supra at 691. Mize additionally argues that his trial counsel improperly used a racial stereotype by characterizing Mize as a "redneck" and a "racist" during closing argument. See *Kornegay v. State*, 174 Ga. App. 279 (329 SE2d 601) (1985). Viewed in context, the defense's characterization of their client was a reasonable attempt to persuade the jury that Mize's unpopular views should not cause them to lean toward conviction (i.e., Mize may be racist but he is not a murderer), and that his Klan affiliation caused the police to rush to judgment. Judicial scrutiny of counsel's performance must be highly deferential, and the fact that Mize now disagrees with counsel's tactical choices does not require a finding of ineffective assistance of counsel. *Strickland*, supra; *Stewart v. State*, 263 Ga. 843 (6) (440 SE2d 452) (1994). We conclude that the trial court did not err by finding that Mize's counsel was not ineffective.

12. Mize refused to allow his attorneys to investigate and prepare for a mitigation defense during the sentencing phase of his trial. After the jury reached a guilty verdict, Mize informed the trial court that he had forbidden his lawyers from presenting a mitigation case, against his counsel's advice. Mize stated that, as a Christian, he believed in an "eye for an eye" and that, since the jury believed him to be guilty of murder, he should receive a death sentence. The trial court ordered a mental evaluation and a competency hearing before the trial could proceed. The psychologist testified that Mize was competent and was making an informed decision, and the trial court allowed the trial to continue. Mize took the stand, against his lawyer's advice, and asked the jury to return a death sentence. No other evidence was presented by Mize during the sentencing phase. Mize's lawyer then argued in closing that the State had failed to prove the statutory aggravating circumstances (Mize had tried to prevent his lawyer from arguing on his behalf in the sentencing phase but the trial court had refused to accede to this request). The trial court

instructed the jury on all three sentencing options, and charged that they could return a life sentence for any reason or no reason at all.

Mize now complains that it was error to allow him to prevent the introduction of mitigation evidence. We disagree. The record reveals that Mize's lawyers, despite Mize's resistance, conducted some investigation of Mize's background and informed Mize about pursuing a mitigation defense. But the final decision about the defense belonged to Mize.

> [A]fter having been informed, the defendant, and not his attorney, makes the ultimate decision about, for example, what line of defense to pursue, [cit.], whether or not to testify in his own behalf, [cit.], whether or not to plead guilty, [cit.], and whether or not to present witnesses in mitigation, [cit.].

*Morrison v. State*, 258 Ga. 683 (3) (373 SE2d 506) (1988). "[W]here a properly-informed, competent defendant insists that he prefers a death sentence to life imprisonment, his attorney does not violate any right of the defendant by attempting 'to comply with his client's wishes.'" *Morrison*, supra. Ethical Consideration 7-8 states, in part:

> In the final analysis, however, the lawyer should always remember that the decision whether to forego legally available objectives or methods because of nonlegal factors is ultimately for the client and not for himself.

The record shows that Mize was competent and understood his decision. See EC 7-12; *Morrison*, supra. The death sentence in this case is supported by the statutory aggravating circumstances and was not imposed under the influence of passion, prejudice or other arbitrary factor. OCGA § 17-10-35 (c) (1), (2). Accordingly, we find no error.

13. The trial court instructed the jury on life without the possibility of parole: "Mr. Mize would be incarcerated for the remainder of his natural life and would not be eligible for parole unless he is subsequently adjudicated to be innocent of the offense for which he was sentenced." This jury charge tracked the language of OCGA § 17-10-31.1 (d) (1), and was proper. *Henry v. State*, 265 Ga. 732 (10) (c) (462 SE2d 737) (1995).

14. Mize claims that one of the statutory aggravating circumstances found by the jury, OCGA § 17-10-30 (b) (6), is invalid because it applies only to contract killings. OCGA § 17-10-30 (b) (6) states: "The offender caused or directed another to commit murder or committed murder as an agent or employee of another person." Mize points to *Whittington v. State*, 252 Ga. 168 (9) (a) (313 SE2d 73) (1984), where this Court held that the (b) (6) aggravating circum-

stance does not apply to a defendant who commits murder at some-one else's behest, without the promise of remuneration. However, the court in *Whittington* specifically declined to address whether (b) (6) would apply to the person who ordered the murder, and the person who ordered Whittington to commit murder received a life sentence when the jury deadlocked. Id. We conclude that a plain reading of the (b) (6) aggravating circumstance shows that it applies to a defendant who causes or directs a follower or lackey to commit murder, even if the murder is not for hire. The evidence showed that Mize, as leader of a small group, directed a follower or followers to murder Tucker because Tucker had failed to follow his orders. The (b) (6) aggravating circumstance applies to this situation.

15. Mize complains that the trial court erred by allowing the jury to learn about one of Mize's prior convictions during the sentencing phase. Mize had four previous felony convictions: robbery (1977), escape (1978), arson (1987), and possession of a firearm by a convicted felon (1987). The trial court ruled that the certified copy of the robbery conviction, which resulted from a guilty plea, was not admissible because the State lacked a transcript of the plea colloquy to prove that the plea was intelligent and voluntary. *Pope v. State*, 256 Ga. 195 (17) (345 SE2d 831) (1986) (once the defendant raises the issue of the voluntariness of a guilty plea that resulted in a prior conviction, the State has the burden of proving a valid waiver before the conviction may be used in aggravation of sentence). The convictions for arson, escape and possession of a firearm by a convicted felon resulted from jury trials, and the trial court ruled that the certified copies of these convictions were admissible. Mize objected to the admission of the escape and possession of a firearm by a convicted felon convictions because the certified copies of those convictions specifically referenced Mize's 1977 robbery conviction. The trial court ruled that the certified copies of the convictions for escape and possession of a firearm by a convicted felon were admissible. Mize asserts that this ruling was error under *Pope*, supra, because the jury was able to learn about his inadmissible robbery conviction. We disagree.

In *Pope*, this Court held that the State has the burden to prove a valid waiver before a conviction resulting from a guilty plea may be used as aggravating evidence during the sentencing phase. Id. The State must prove that the earlier plea was voluntary and intelligent because "presuming waiver from a silent record is impermissible." *Boykin v. Alabama*, 395 U. S. 238, 242 (89 SC 1709, 23 LE2d 274) (1969). The trial court thus correctly ruled that the certified copy of Mize's 1977 robbery conviction was inadmissible. *Pope*, supra. The trial court, however, was not required to purge later convictions where the robbery conviction was proven as an element of the

offense. The convictions for escape and possession of a firearm by a convicted felon resulted from jury trials, and both escape and possession of a firearm by a convicted felon require that the underlying previous felony conviction be proven as an element of the crime. OCGA §§ 16-10-52; 16-11-131; *Norris v. State*, 227 Ga. App. 616 (1) (489 SE2d 875) (1997) (proof of the prior conviction is required in felony escape trials); *Favors v. State*, 182 Ga. App. 179 (2) (355 SE2d 109) (1987) (possession of a firearm by a convicted felon requires that the previous felony conviction be proven to the jury as one of the elements of the crime). The certified copies of Mize's indictments for escape and possession of a firearm by a convicted felon show that his 1977 robbery conviction was the previous, underlying conviction for both of these later convictions. Therefore, two juries have found beyond a reasonable doubt that Mize was convicted of robbery in 1977 as an element of these separate convictions. The trial court did not err by admitting certified copies of Mize's convictions for escape and possession of a firearm by a convicted felon. Mize also claims that the State was required to prove that his jury trial convictions were valid before they could be used in aggravation, but the State only has this burden with regard to the validity of guilty pleas. See *Pope*, supra; *Boykin*, supra. Mize additionally asserts that his attorney was laboring under a conflict of interest at his escape trial, and that the jury was tainted at his trial for possession of a firearm by a convicted felon. Since Mize did not raise these objections at trial, they are waived on appeal. *Earnest*, supra.

16. Mize claims that one of his attorneys violated the duty of loyalty and that this conflict of interest requires a new trial. From the beginning, Mize had refused to allow his lawyers to develop mitigation evidence in preparation for the sentencing phase of his trial. Mize's counsel asked Nancy Mau, an attorney with the MultiCounty Public Defender, to speak with Mize in an attempt to get his social history and to convince him to allow his attorneys to conduct a mitigation defense. Ms. Mau met with Mize and managed to obtain some limited information, but Mize continued to refuse to allow a mitigation defense. At no time did Mau actually represent Mize, and she conducted no investigation on his behalf. She testified that the staff at the MultiCounty Public Defender's Office frequently serve in an advisory capacity for attorneys representing capital defendants, and she considered herself only an advisor in the Mize case. Later, Ms. Mau met with Samantha Doster, at the request of Doster's counsel, and she encouraged Doster to keep her lawyer (Doster had threatened to fire her lawyer) and to seek a deal from the State. Doster's counsel was present for this meeting, and he had informed Mau that he was trying to strike a deal with the State. There was no conflict of interest in Mau meeting both Doster and Mize because

Mau did not represent either of them, and her role in both cases was very limited. "A theoretical or speculative conflict will not impugn a conviction which is supported by competent evidence." *Lamb v. State*, 267 Ga. 41 (1) (472 SE2d 683) (1996). We find no error.

17. The death penalty in this case was not imposed under the influence of passion, prejudice or other arbitrary factor. OCGA § 17-10-35 (c) (1). The death sentence is also not excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. OCGA § 17-10-35 (c) (3). The cases listed in the Appendix support the imposition of the death penalty in this case as they all involve the (b) (6) or (b) (7) aggravating circumstances.

*Judgment affirmed. All the Justices concur.*

APPENDIX.

*Waldrip v. State*, 267 Ga. 739 (482 SE2d 299) (1997); *Jones v. State*, 267 Ga. 592 (481 SE2d 821) (1997); *Carr v. State*, 267 Ga. 547 (480 SE2d 583) (1997); *Crowe v. State*, 265 Ga. 582 (458 SE2d 799) (1995); *Ledford v. State*, 264 Ga. 60 (439 SE2d 917) (1994); *Hill v. State*, 263 Ga. 37 (427 SE2d 770) (1993); *Davis v. State*, 263 Ga. 5 (426 SE2d 844) (1993); *Castell v. State*, 250 Ga. 776 (301 SE2d 234) (1983).

DECIDED JUNE 15, 1998 —
RECONSIDERATION DENIED JULY 30, 1998.

*Palmer C. Singleton III,* for appellant.

*Harry N. Gordon, District Attorney, Gerald W. Brown, Assistant District Attorney, Thurbert E. Baker, Attorney General, Susan V. Boleyn, Senior Assistant Attorney General, Beth Attaway, Assistant Attorney General,* for appellee.