## S03A0525. HEAD v. STRIPLING.
(590 SE2d 122)

HUNSTEIN, Justice.

In October 1988 Alphonso Stripling shot four of his fellow employees at a Kentucky Fried Chicken restaurant during an armed robbery. Two of his victims died. He then carjacked a getaway car at gunpoint from the parking lot of a nearby restaurant and crashed it while being chased by the police. At his 1989 trial, Stripling's counsel presented evidence of mental illness and mental retardation. The jury, while convicting Stripling of the crimes arising out of the KFC robbery, did not find him guilty but mentally ill or guilty but mentally retarded. The jury recommended a death sentence. This Court affirmed. *Stripling v. State*, 261 Ga. 1 (401 SE2d 500) (1991).

Stripling filed a petition for a writ of habeas corpus. After an evidentiary hearing in April 2002, the habeas court vacated Stripling's death sentence finding that the State had violated *Brady v. Maryland*, 373 U. S. 83 (83 SC 1194, 10 LE2d 215) (1963), by suppressing evidence supporting his claim of mental retardation. Warden Frederick Head appeals that ruling, along with the habeas court's other rulings, including that Stripling be sentenced to a non-capital sentence based on a finding that his death sentence was a miscarriage of justice because he is mentally retarded; that OCGA § 17-7-131 is unconstitutional to the extent that it requires a defendant to prove his mental retardation beyond a reasonable doubt in the guilt-innocence phase of a death penalty trial; and that Stripling received ineffective assistance of trial counsel. For the reasons set forth below, we affirm the habeas court's ruling on Stripling's *Brady* claim and order that he be retried on mental retardation and sentence.

1. The habeas court correctly ruled that the State violated *Brady* by suppressing parole records that contained material, exculpatory evidence regarding Stripling's mental retardation. According to trial counsel, Stripling's death penalty trial may have been the first where guilty but mentally retarded was a potential verdict. OCGA § 17-7-131 had only been enacted the previous year, and Georgia was the first state to forbid the execution of those criminals found to be men-

tally retarded.[1] In preparation for Stripling's trial, defense counsel researched mental retardation and Stripling's background. Defense counsel also sought to obtain Stripling's parole file because they believed there might be important evidence contained therein. "Records in the possession of the State Board of Pardons and Paroles are confidential. OCGA § 42-9-53." *Stripling*, supra, 261 Ga. at 6 (7). Pursuant to this Court's holding in *Pope v. State*, 256 Ga. 195 (22) (345 SE2d 831) (1986) (policy reasons for preserving the secrecy of parole files must give way to capital defendant's need to uncover and present mitigating evidence), the trial court in Stripling's case received the parole file and evaluated it in camera. The trial court then informed the parties that there was relevant evidence in the parole file but that it was cumulative to the testimony of Stripling's psychiatrist, who had testified in the competency trial that had preceded the death penalty trial. The trial court did not release the parole file and neither the prosecutor nor Stripling's counsel saw its contents.

At trial, defense counsel adduced evidence before the jury that Stripling had achieved mostly Ds and Fs before leaving high school at age 16, and his mother testified that he had been a slow learner and had few friends as a child. A psychiatrist and a psychologist hired by the defense evaluated Stripling for mental retardation and mental illness. The psychologist administered an IQ test to Stripling, who scored a 64. The defense mental health experts also testified about deficits in adaptive behavior, such as his limited ability to read and write, and opined that he is mentally retarded. Because Stripling had been incarcerated twice previously for armed robberies, defense counsel obtained his records from the Department of Corrections, which showed he had scored a 68 on an IQ test in 1974 when he was 17 years old and that his reading and mathematics skills were limited to approximately the third or fourth grade level.

The State countered Stripling's claim of mental retardation by adducing evidence that Stripling had attended school until the tenth grade and dropped out because of his arrest for several armed robberies. Although he did not administer an IQ test, the State's psychologist evaluated Stripling and opined that he has average intelligence. With regard to adaptive behavior, the State presented evidence that Stripling held several jobs, had a driver's license, and

---

[1] OCGA § 17-7-131 (a) (3) defines mental retardation as "having significantly subaverage general intellectual functioning resulting in or associated with impairments in adaptive behavior which manifested during the developmental period." While not by itself conclusive, the generally accepted IQ score for an indication of mental retardation is approximately 70 or below. *Stripling*, supra, 261 Ga. at 4 (3) (b). Other indicators for mental retardation are deficits in adaptive behavior and an onset before age 18. Id.

knew how to drive a car with a manual transmission. Neither of the surviving KFC employees thought that he had seemed slow or had difficulty learning to operate the various machines for marinating and cooking chicken.[2] Stripling had participated in bank robberies in 1979 and 1980 that showed some degree of planning. His Department of Corrections records indicated that he had taken vocational training classes in prison and performed satisfactorily. There were several references in the prison records to his having a "rather low level of intellectual functioning," but these references were offset by written comments about his low motivation to perform better and by other comments that Stripling has a normal level of intelligence. Of primary importance to the State was a Culture Fair IQ test also taken in prison that showed a score of 111. Neither of Stripling's experts was familiar with the Culture Fair test, and the State argued that this above-average score was more indicative of Stripling's intelligence. His prison and school records did not indicate he was mentally retarded, despite, as previously mentioned, a Peabody IQ test taken in prison in 1974 that reflected a 68 IQ. The prosecutor thus argued that no one had characterized Stripling as mentally retarded until defense experts examined him after the KFC murders when he had a motive to portray himself as mentally retarded.[3]

In his appeal to this Court, Stripling not only challenged the jury's rejection of a guilty but mentally retarded verdict, he also claimed that the failure to release his parole file was error, despite not knowing what that file contained. This Court disagreed. *Stripling*, supra, 261 Ga. at 6 (7).

More than a decade after Stripling's trial, his habeas counsel was able to secure access to his parole file during habeas corpus litigation. The parole file contains a number of documents that were duplicated in Stripling's DOC prison records. However, the parole file also contains information supporting Stripling's claim of mental retardation that was not available elsewhere. An institutional report from 1974 set forth that Stripling has "serious mental deficiencies." A parole investigator in a 1980 report stated that the Culture Fair IQ score of 111 was "questionable" because Stripling's mother characterized him as "mentally retarded" and an IQ test taken in 1973, which was not referenced in the materials elsewhere available to defense

---

[2] Stripling had only been working at KFC for about a week when he committed the robbery and murders.

[3] For example, the prosecutor argued:

[I]f there was mental illness or mental retardation in Alphonso Stripling, do you think maybe possibly somebody might have caught it before now? Maybe? You think so? Isn't it a peculiar coincidence that we've suddenly discovered that Alphonso was mentally ill and mentally retarded two months before he goes on trial for the electric chair?

counsel, recorded an IQ score of 67. The investigator described Stripling as having "limited mental ability." An institutional parole supervisor interviewed Stripling in 1974, when Stripling was 17 years old, and reported that he answered questions slowly "due to his mentally retarded condition." The supervisor stated in his concluding remarks that Stripling has limited mental ability and "is mentally retarded."

The parole file thus contained compelling evidence to support Stripling's trial claim of mental retardation. That State officials and his mother had characterized him as mentally retarded in the 1970's would have refuted the prosecutor's claim that the defense had recently concocted his alleged mental retardation. Similarly, a State official describing Stripling's score on the Culture Fair IQ test as "questionable" would have undermined the prosecutor's reliance on this test as direct evidence of his actual intelligence. The parole file also contained another sub-70 IQ score on an IQ test taken when Stripling was 16 years old. All of this evidence would have been especially significant because it predated the KFC murders and was created by State officials.

The trial court did not permit defense counsel to see this file; thus, counsel were not able to argue the benefits and potential effect of using this evidence at trial to support Stripling's mental retardation claim. Counsel could make no specific claims about the file at trial or on appeal. Instead, on appeal Stripling could only argue generally that the failure to allow access to the contents of the file was error. See *Pope*, supra, 256 Ga. at 212 (22); *Walker v. State*, 254 Ga. 149 (4) (327 SE2d 475) (1985). This Court noted that the trial court had found "no potentially mitigating evidence in the file not already known to and available to the defendant," *Stripling*, supra, 261 Ga. at 6 (7), and determined that the trial court had not erred. Id.

On habeas corpus, after finally obtaining access to the parole file, Stripling made a claim under *Brady* that the State had suppressed exculpatory evidence in the parole file.[4] The warden responded that the issue was barred from habeas review because it had been addressed on direct appeal when this Court determined that there was no error in the non-disclosure of the parole file. See *Turpin v. Lipham*, 270 Ga. 208 (1) (510 SE2d 32) (1998). However, the record clearly establishes that Stripling did not claim *Brady* error on direct appeal; he only claimed error under *Pope*, supra. Nor could a *Brady* error have been asserted on appeal because Stripling did not know what was contained in the parole file and thus could only have speculated about the withheld material.

---

[4] Stripling had also filed a *Brady* motion before his 1989 trial.

If the trial court performs an in camera inspection and denies the defendant access to certain information, on appeal the appellant has the burden of showing both the materiality and the favorable nature of the evidence sought. [Cit.] Mere speculation that the items the appellant wishes to review possibly contain exculpatory information does not satisfy this burden. [Cit.] "If the appellant desires to have this inspection reviewed by this court, she must point out what material she believes to have been suppressed and show how she has been prejudiced." [Cit.]

*Williams v. State*, 251 Ga. 749, 789 (312 SE2d 40) (1983). See also *Ledesma v. State*, 251 Ga. 487 (10) (306 SE2d 629) (1983).

Because Stripling's argument on direct appeal regarding the parole file was not a *Brady* claim, we conclude that no procedural bar foreclosed the habeas court from addressing this claim on the merits on habeas corpus. Compare *Roulain v. Martin*, 266 Ga. 353 (1) (466 SE2d 837) (1996). Moreover, procedural default did not operate to prevent the habeas court's consideration of Stripling's *Brady* claim because Stripling could not have raised such a claim before learning about the contents of the parole file. See *Williams*, supra, 251 Ga. at 789; *Turpin v. Todd*, 268 Ga. 820 (2) (493 SE2d 900) (1997) (explaining cause and prejudice test for overcoming procedural default). Thus, we agree with the habeas court that this issue is not procedurally barred or defaulted.

With regard to the merits of Stripling's *Brady* claim, the habeas court found that such a violation had occurred and that Stripling must be retried. In so holding, the habeas court found that Stripling showed that: (A) the State possessed evidence favorable to his defense; (B) he did not possess the evidence, nor could he obtain it himself with any reasonable diligence; (C) the State suppressed the favorable evidence; and (D) had the evidence been disclosed to him, there is a reasonable probability that the outcome of his trial would have been different. See *Mize v. State*, 269 Ga. 646 (2) (501 SE2d 219) (1998); *Zant v. Moon*, 264 Ga. 93, 100 (440 SE2d 657) (1994). Our review of the record reflects that the evidence amply supports the habeas court's findings.

(A) The State possessed the parole file. The record shows that the Attorney General's office possessed the file before trial and transmitted it to the trial court for review. Although the Attorney General represents the State on appeals in death penalty cases (OCGA § 45-15-3 (5)), the Attorney General's office usually does not become involved with death penalty cases at the initial trial level. Therefore, it is generally not part of the "prosecution team" for which the prosecutor must make disclosures under *Brady*. See *Kyles v. Whitley*, 514

U. S. 419, 437 (115 SC 1555, 131 LE2d 490) (1995) (an individual prosecutor is presumed to have knowledge of all information gathered in connection with his office's investigation of the case and has a "duty to learn of any favorable evidence known to the others acting on the government's behalf in the case"); *Moon*, supra, 264 Ga. at 99 (3). Our definition of the prosecution team responsible for *Brady* disclosures cannot be a monolithic view of government that would impute to the prosecutor the knowledge of persons in state agencies not involved in the prosecution. See *United States v. Avellino*, 136 F3d 249, 255 (2d Cir. 1998). Such a wide definition would be unworkable. See id. However, in Stripling's case, his parole file was not held unbeknownst to the prosecutor by a state agency uninvolved in the prosecution. Litigation over the parole file was a part of the case and the Attorney General became directly involved on behalf of the State of Georgia on the *specific* issue of Stripling's request to see his parole file. "For purposes of *Brady*, we decide whether someone is on the prosecution team on a case-by-case basis by reviewing the interaction, cooperation and dependence of the agents working on the case." (Footnote omitted.) *Harridge v. State*, 243 Ga. App. 658, 660-661 (1) (534 SE2d 113) (2000). See also *Moon*, supra; *Ferguson v. State*, 226 Ga. App. 681 (2) (487 SE2d 467) (1997). We conclude, under the circumstances of this case, that the Attorney General's office became a part of the prosecution team at Stripling's trial due to its involvement over the parole file and that it possessed evidence favorable to Stripling's case. See *Harridge,* supra (GBI laboratory part of prosecution team due to its testing of defendant's blood and victim's blood and urine). Compare *Black v. State*, 261 Ga. App. 263 (3) (582 SE2d 213) (2003) (Department of Family and Children Services not part of the prosecution team for *Brady* purposes).

(B) It is uncontroverted that Stripling did not possess this evidence and could not obtain it despite diligent efforts to do so. The key evidence contained in the parole file was not available elsewhere. To the extent that our opinion on direct appeal implies that the trial court correctly determined that the evidence was cumulative of evidence already in Stripling's possession, we conclude that this finding was based on an incorrect reading of the record. See *Brown v. Francis*, 254 Ga. 83 (3) (326 SE2d 735) (1985) (this Court has the inherent discretionary power to review and correct its own errors).

(C) With regard to the third element of a *Brady* claim, the record shows that the State suppressed the parole file. It is immaterial that the State had a good motive, namely, the statutorily-imposed confidentiality of parole files, because the good or bad faith of the government is irrelevant to the determination of a *Brady* claim. See *Brady*, supra, 373 U. S. at 87 ("the suppression by the prosecution of evidence favorable to an accused upon request violates due process

where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution"). Moreover, a state statute regarding parole file confidentiality cannot trump a capital defendant's constitutional rights. See *Davis v. Alaska,* 415 U. S. 308, 320 (94 SC 1105, 39 LE2d 347) (1974) (state's policy interest in protecting confidentiality of juvenile offender's record must yield to defendant's constitutional right to effective cross-examination of an adverse witness); *Mangum v. State,* 274 Ga. 573 (2) (555 SE2d 451) (2001).

(D) Lastly, as previously discussed, the suppressed evidence was material. Evidence generated by State officials characterizing Stripling as mentally retarded and questioning the only test result relied upon by the State at trial, compiled years before the KFC murders, would have refuted many of the State's arguments and in reasonable probability would have affected the outcome of Stripling's trial.

We therefore affirm the habeas court's finding with regard to the suppression of the parole file. Stripling must be retried on mental retardation and sentence. Because mental retardation must be determined separately, but may also have a bearing on sentencing and involve the same evidence, we direct that the retrial be bifurcated on these issues with mental retardation determined by the jury in the first phase of the trial.

2. Stripling raised the issue of mental retardation at trial, and the jury rejected it. This Court affirmed. *Stripling,* supra, 261 Ga. at 2 (3). On habeas corpus, although the jury had rejected Stripling's claim of mental retardation, the habeas court found after reviewing the same trial evidence and some additional evidence offered during the habeas corpus proceedings that Stripling is mentally retarded and that there is "no credible evidence to the contrary, and therefore no basis for reasonable doubt about [Stripling's] mental condition." The habeas court ruled that Stripling's death sentence must be vacated because it was a "miscarriage of justice" and remanded the case to the trial court, not for retrial on sentence, but for the imposition of an "appropriate non-capital sentence."

This Court has authorized habeas courts to address habeas claims of mental retardation under the "miscarriage of justice" exception to procedural default when mental retardation was not raised at trial. See *Head v. Ferrell,* 274 Ga. 399 (VI) (554 SE2d 155) (2001); *Turpin v. Hill,* 269 Ga. 302 (3) (b) (498 SE2d 52) (1998). In other words, a habeas petitioner who did not raise his alleged mental retardation at trial may do so on habeas corpus without regard to procedural default. Id. The justification for using "miscarriage of justice" in this context arises from Georgia's constitutional prohibition on the execution of mentally retarded criminals; it enables death-sentenced inmates who may possibly be mentally retarded to raise

this claim for the first time when it would otherwise be defaulted.

However, "miscarriage of justice" does not authorize habeas courts to revisit jury verdicts on mental retardation and order different results.

> [Miscarriage of justice] is by no means to be deemed synonymous with procedural irregularity, or even with reversible error. To the contrary, it demands a much greater substance, approaching perhaps the imprisonment of one who, not only is *not* guilty of the specific offense for which he is convicted, but, further, is not even culpable in the circumstances under inquiry. [Cit.]

*Gavin v. Vasquez*, 261 Ga. 568, 569 (407 SE2d 756) (1991). It is "an extremely high standard and is very narrowly applied. [Cits.]" *Walker v. Penn*, 271 Ga. 609, 611 (2) (523 SE2d 325) (1999). See also *Valenzuela v. Newsome*, 253 Ga. 793 (4) (325 SE2d 370) (1985). "Miscarriage of justice" is primarily associated with its core purpose, i.e., to free the innocent who are wrongly convicted, and should rarely be used to overcome otherwise-valid procedural bars. See id. We therefore conclude that the habeas court erred by finding Stripling mentally retarded beyond a reasonable doubt and by ordering the imposition of a non-capital sentence. We reverse this portion of the habeas court's order. In accordance with our holding in Division 1, supra, a jury will determine whether Stripling is mentally retarded and whether he should be sentenced to death.

3. The habeas court also found OCGA § 17-7-131 unconstitutional to the extent that it requires a defendant claiming mental retardation to prove his alleged mental retardation at trial beyond a reasonable doubt.[5] This issue has already been decided adversely to Stripling. See *Head v. Hill*, 277 Ga. 255 (587 SE2d 613) (2003); see also *Mosher v. State*, 268 Ga. 555 (4) (491 SE2d 348) (1997). OCGA § 17-7-131 is constitutional, and the portion of the habeas court's order to the contrary is reversed. On retrial, Stripling must bear the burden of proving his alleged mental retardation beyond a reasonable doubt. See *Head*, supra.

4. The habeas court found that the prosecutor had argued improperly in the guilt-innocence phase closing argument that Stripling would receive a life sentence if found to be mentally retarded by

---

[5] Perhaps because the mental retardation statute was so new, Stripling incorrectly received permission from the trial court to argue in his closing statement in the guilt-innocence phase, and did so argue, that it was *the State* that had the burden to prove Stripling was not mentally retarded beyond a reasonable doubt. The prosecutor agreed and argued in his closing statement, "We have the burden of proof. We gladly accept it."

the jury.[6] See *State v. Patillo*, 262 Ga. 259 (417 SE2d 139) (1992) (jury should not be instructed in guilt-innocence phase that a mental retardation finding would preclude a death sentence). Although the *Patillo* opinion did not issue until after Stripling's direct appeal had been decided and was no longer in the pipeline, see *Taylor v. State*, 262 Ga. 584 (3) (422 SE2d 430) (1992), the habeas court determined that the pipeline rule did not apply because *Patillo* announced a new rule of substantive, rather than procedural, criminal law. This finding by the habeas court was error. See *Luke v. Battle*, 275 Ga. 370, 372-373 (565 SE2d 816) (2002) (a new substantive rule of criminal law alters the meaning of a criminal statute to affect the prohibited conduct); *Harris v. State*, 273 Ga. 608 (2) (543 SE2d 716) (2001). Because Stripling's direct appeal was no longer in the pipeline when *Patillo* announced a new procedural rule, its holding should not be applied retroactively to Stripling's case. See id.; see also *Teague v. Lane*, 489 U. S. 288 (IV) (109 SC 1060, 103 LE2d 334) (1989). The habeas court's ruling on Stripling's *Patillo* claim is reversed.

5. Based on our holding in Division 1 that Stripling must be retried as to mental retardation and sentencing, we need not address the warden's enumerations asserting error in the habeas court's finding of ineffective assistance of trial counsel as well as Stripling's remaining habeas claims. The habeas court found, and we affirm, that the evidence of Stripling's guilt was overwhelming and that his convictions are therefore unaffected.

*Judgment affirmed in part and reversed in part. All the Justices concur, except Fletcher, C. J., Sears, P. J., Benham and Carley, JJ., who concur in part and dissent in part.*

SEARS, Presiding Justice, concurring in part and dissenting in part.

I concur in the majority's ruling remanding this matter to the trial court for retrial on the issues of mental retardation and sentencing. For the reasons outlined in my dissent to *Head v. Hill*, 277 Ga. 255 (587 SE2d 613) (2003), however, I dissent to the majority's ruling requiring Stripling to establish his mental retardation in the trial court beyond a reasonable doubt.

I am authorized to state that Chief Justice Fletcher and Justice Benham join in this dissent.

CARLEY, Justice, concurring in part and dissenting in part.

I concur in Divisions 2, 3 and 4, wherein the majority holds that

---

[6] Stripling did not object to this argument. In fact, the trial record shows that both parties argued to the jury in the guilt-innocence phase that a finding of mental retardation would result in a life sentence.

the habeas corpus court erred in its findings that Stripling is mentally retarded beyond a reasonable doubt, that OCGA § 17-7-131 is unconstitutional and that our decision in *State v. Patillo*, 262 Ga. 259 (417 SE2d 139) (1992) should be given retroactive effect. However, I respectfully dissent to Division 1, which holds that Stripling is entitled to a new sentencing trial based upon the State's alleged violation of *Brady v. Maryland*, 373 U. S. 83 (83 SC 1194, 10 LE2d 215) (1963).

In *Stripling v. State*, 261 Ga. 1 (401 SE2d 500) (1991), we affirmed Stripling's conviction and death sentence. Today's affirmance of the grant of habeas corpus relief notwithstanding our disposition of the direct appeal is completely dependent upon the majority's conclusion that "the record clearly establishes that [he] did not claim *Brady* error on direct appeal; he only claimed error under *Pope* [*v. State*, 256 Ga. 195, 212 (22) (345 SE2d 831) (1986)]." Majority opinion, p. 406. Because the majority thereby mischaracterizes the scope of the issue actually resolved in Stripling's direct appeal, his *Brady* claim is procedurally barred and the habeas court erred in granting relief based thereon. " 'One who had an issue decided adversely to him on direct appeal is precluded from relitigating that issue on habeas corpus, (cit.). . . .' [Cit.]" *Roulain v. Martin*, 266 Ga. 353-354 (1) (466 SE2d 837) (1996).

In *Stripling v. State*, supra at 6 (7), this Court addressed Stripling's claim regarding the disclosure of his records in possession of the Board of Pardons and Paroles, and held that "the non-disclosure provisions of OCGA § 42-9-53 must give way to the defendant's right of access to potentially mitigating evidence. [Cits.]" Contrary to the implication of today's opinion, *Pope* is not the only authority cited for that holding. We also cited *Pennsylvania v. Ritchie*, 480 U. S. 39 (107 SC 989, 94 LE2d 40) (1987) as a decision which was in "accord" with *Pope*. *Ritchie*, as did *Pope*, dealt with records in the custody of a state agency which were protected from disclosure pursuant to statute. The only difference is that the records at issue in *Ritchie* were those of the Children and Youth Services, rather than the Board of Pardons and Paroles. In concluding that the constitutional rights of the defendant must take precedence over the Pennsylvania statute providing for confidentiality of the records, the Supreme Court of the United States held that "[it] is well settled that the government has the obligation to turn over evidence in its possession that is both favorable to the accused and material to guilt or punishment. . . . *Brady v. Maryland*, supra, at 87." *Pennsylvania v. Ritchie*, supra at 57 (III) (B) (2). Thus, it is abundantly clear that *Ritchie* must be construed as a specific application of *Brady* in those circumstances involving allegedly exculpatory evidence which is possessed by a state agency and which is entitled to confidentiality under a state statute. Likewise, *Pope* is also a *Brady* case, holding that a criminal

defendant in Georgia is entitled to exculpatory evidence held by the Board of Pardons and Paroles, notwithstanding OCGA § 42-9-53. Confidentiality in those records does "not outweigh a capital defendant's need for access to potentially mitigating evidence. [Cit.]" *Pope v. State*, supra at 212 (22).

Accordingly, the majority incorrectly concludes that Stripling's direct appeal dealt only with a *Pope* claim which did not implicate *Brady*. Indeed, *Pope* is itself a *Brady* case, even though that decision was not cited therein. According to the majority's analysis, no constitutional issue, such as those raised pursuant to *Miranda v. Arizona*, 384 U. S. 436 (80 SC 1602, 16 LE2d 694) (1966) or *Batson v. Kentucky*, 476 U. S. 79 (106 SC 1712, 9 LE2d 69) (1986), is ever conclusively resolved on direct appeal. Consequently such contentions can be relitigated by a habeas court, unless, in rejecting the defendant's claim of error, the appellate court expressly cited the relevant seminal decision of the Supreme Court of the United States. The fallacy in such a narrow construction of appellate decisions is apparent. Substance, not the citation of authority, is the controlling factor in determining the legal scope and effect of a holding. Thus, the lack of an express citation to *Brady* in either *Pope* or *Stripling* is immaterial. In substance, both appeals address *Brady* issues. Moreover, the specific citation in *Stripling v. State*, supra at 6 (7), to *Ritchie* is additional proof that, in resolving the claim regarding records held by the Board of Pardons and Paroles, this Court was relying upon the rationale of *Brady*. Because *Ritchie* is clearly a *Brady* case, so too is *Stripling* by necessary implication.

The majority seeks to justify its narrow construction of the holding in *Stripling v. State*, supra at 6 (7), by stating that Stripling could not have raised a *Brady* error in his direct appeal, "because [he] did not know what was contained in the parole file and thus could only have speculated about the withheld material." Majority opinion, p. 406. However, this conclusion betrays a fundamental misunderstanding of *Brady*. Under that decision, Stripling's "interest (as well as that of the [State]) in ensuring a fair trial can be protected fully by requiring that the . . . files be submitted only to the trial court for [an] in camera review." *Pennsylvania v. Ritchie*, supra at 60 (III) (C). That is precisely the procedure which was followed in *Stripling*. "The trial court reviewed [his] parole file and determined there was no potentially mitigating evidence in the file not already known to and available to the defendant." *Stripling v. State*, supra at 6 (7). Consistent with the applicable procedure for assessing the trial court's ruling, this Court conducted its own review of the records on appeal, and found "no error in the non-disclosure of the defendant's parole file. [Cit.]" *Stripling v. State*, supra at 6 (7).

Thus, Stripling did assert a *Brady* violation in his direct appeal,

and this Court rejected it. The fact that, on habeas, Stripling has now identified material in the records which he contends is exculpatory does not show the existence of a viable claim of *Brady* error. Instead, his argument in that regard constitutes an unauthorized attempt to relitigate this Court's previous holding that the records do not contain any beneficial material which was not otherwise known and available to the defense. "Claims that were previously litigated and decided on direct appeal are barred because it is well-settled that '(a)fter an appellate review the same issue( ) will not be reviewed on habeas corpus.' [Cits.]" *Turpin v. Mobley,* 269 Ga. 635, 636 (1) (502 SE2d 458) (1998). The majority concludes that Stripling can readvance his previously rejected assertion because this Court's holding in *Stripling v. State,* supra at 6 (7), that the mitigating evidence was merely cumulative "was based on an incorrect reading of the record" and is subject to our "inherent discretionary power to review and correct [our] own errors." Majority opinion, p. 408. Whatever the permissible scope of this Court's authority to correct its own errors, however, it certainly does not extend to relitigating in the context of habeas corpus issues which were previously decided on direct appeal.

> The "law of the case" doctrine is not confined to civil cases, but applies also to rulings made by appellate courts in criminal cases. [Cit.] Thus, in this civil action, the habeas court, as well as this Court, would certainly be bound by the ruling in [*Stripling v. State,* supra at 6 (7)], regardless of whether that ruling may be erroneous. [Cits.]

*Roulain v. Martin,* supra at 354 (1). See also *Turpin v. Mobley,* supra at 636 (1); *Gaither v. Gibby,* 267 Ga. 96, 97 (2) (475 SE2d 603) (1996); *Davis v. Thomas,* 261 Ga. 687, 689 (2) (410 SE2d 110) (1991); *Gunter v. Hickman,* 256 Ga. 315, 316 (1) (348 SE2d 644) (1986); *Elrod v. Ault,* 231 Ga. 750 (204 SE2d 176) (1974). Compare *Brown v. Francis,* 254 Ga. 83, 86 (3) (326 SE2d 735) (1985) (jurisdiction to consider new grounds not previously asserted in original habeas petition). If, as the majority holds, this Court is entitled to correct perceived errors in *Stripling v. State,* supra, then the long-standing "law of the case" rule is no longer in effect in this state, and a habeas court is free to redetermine and reverse any of our previous rulings made in a petitioner's direct appeal. In effect, the habeas court now becomes a forum for appellate review of this Court's prior disposition of the very same case.

Division 1 of today's opinion begins with a misconstruction of the holding in *Stripling v. State,* supra at 6 (7), as addressing something other than an alleged *Brady* error, and concludes with a wholesale rejection of the "law of the case" principle. Application of the correct

analysis compels the conclusion that this Court disposed of the merits of Stripling's *Brady* claim in the direct appeal, and neither the habeas court nor this Court is now authorized to second-guess that disposition. Accordingly, the grant of habeas relief on that ground was erroneous and should be reversed.

DECIDED OCTOBER 14, 2003 —
RECONSIDERATION DENIED NOVEMBER 26, 2003.

*David McDade, District Attorney, Karen A. Johnson, Assistant District Attorney, Thurbert E. Baker, Attorney General*, for appellant.
*Mayer, Brown, Rowe & Maw, Diane G. Kelly, Mitchell D. Raup, David M. Gossett, Carl J. Summers*, for appellee.
*James C. Bonner, Jr., Sarah L. Gerwig, Michael M. Mears, Holly L. Geerdes, Gerald R. Weber, Jr., John R. Martin, Nicholas A. Lotito*, amici curiae.