## A03A2237. ANDERSON v. THE STATE.
### (594 SE2d 669)

JOHNSON, Presiding Judge.

A jury found Jeremy Anderson guilty of three counts of armed robbery, possession of a firearm by a convicted felon, and possession of a firearm during the commission of a felony. He appeals from the convictions entered on the verdicts, challenging the sufficiency of the evidence to support the verdicts, and contending that the trial court erred in denying his motion to suppress evidence seized from his home during his arrest, in admitting witness identification evidence when the identification procedures used at the crime scene and the police station were impermissibly suggestive, and in allowing a witness to testify when her name was not on the state's witness list. None of these enumerations has merit, so we affirm Anderson's convictions.

1. Anderson argues that the evidence was not sufficient to prove his guilt inasmuch as four alibi witnesses testified that he was elsewhere at the time of the robberies, the evidence conflicted as to whether the perpetrator wore his hair pulled back, in an Afro, or braided, and one victim said she remembered Anderson's unusual cheekbones, but that facial feature was not mentioned in the police reports. We find that the evidence was sufficient.

On appeal the evidence must be viewed in the light most favorable to support the verdict, and an appellant no longer enjoys a presumption of innocence; moreover, an appellate court determines evidence sufficiency and does not weigh the evidence or determine witness credibility.[1] When the sufficiency of the evidence is challenged, this Court considers whether a rational trier of fact could have found the defendant guilty of the charged offenses beyond a reasonable doubt.[2]

The evidence shows that at about 4:30 p.m. a man wearing a blue and black striped sweater and a bandanna on the bottom of his face entered a shoe store on Victory Drive and ran to the sales counter. He pointed a gun at the cashier and demanded that the cashier open the cash register. The cashier complied, and the man took money from the register. The robber then approached a cus-

---

[1] *Martin v. State*, 242 Ga. App. 273 (529 SE2d 417) (2000).
[2] Id. at 274.

tomer. He pushed the gun to her chest and demanded her purse. She tossed her purse to him; he picked it up and ran out the door.

Just outside the door, the man encountered the customer's daughter. He instructed her to give him her purse. The man took the purse from the woman's shoulder and ran along the side of the store and through an opening in a fence. A bystander saw a man running on the dirt path leading from Victory Drive to Clarabelle Street. The man had a bandanna over part of his face, and was carrying something under his sweater.

Moments earlier, a 12-year-old girl was walking home when she noticed Anderson get out of a red car and change clothes on the path behind her home. He put on a blue and black striped long-sleeved shirt. A few minutes later, she saw Anderson run back on the path from the shoe store, get into the car, and drive away. The girl knew Anderson as someone who stayed across the street in apartment number 3 of the Clarabelle Apartments. The girl told her mother, and the mother contacted police.

After interviewing the girl, police officers went to the Clarabelle Apartments and saw four men standing near a red car. The car was parked in front of apartment 3. The men, one of whom was Anderson, moved as if they were trying to get away from the car and into the apartment. The officers ordered the men to stop, but they refused and began retreating into the apartment. The officers pursued the men, and as the men went in, the officers grabbed them, catching them at the door. The officers told the men they wanted to talk to them about a robbery. Winifred Jackson, Anderson's fiancée and the lessee of the one-bedroom apartment, gave officers permission to search the apartment. She told officers that a laundry hamper in the bedroom contained Anderson's clothes. Officers found in the hamper a handgun and a shirt similar to the one witnesses said the robber wore.

Police immediately took Anderson and Walker, another one of the men who had been standing near the red car, to the shoe store; this was less than an hour after the robbery occurred. Although there was evidence that at the time of the robbery Anderson's hair was combed straight back, it had been "all combed out" and the ends braided since the robbery. As soon as the officers placed a cap on Anderson's head, the cashier "knew it was him." The cashier was positive about his identification, and positively identified the blue and black striped sweater and handgun found in Jackson's apartment as those used by the robber.

A short time later, Anderson was taken to the police station, where the store customer identified him as the robber. She was "absolutely positive" that he was the robber. She also identified the shirt and handgun found in Jackson's apartment as similar to the

items worn and used by the assailant. At trial, she again identified the shirt and gun as those used by the robber, with no question in her mind. The customer's daughter identified Anderson as the robber, with no doubt in her mind, and recognized the gun and shirt seized by police as those used in the robbery. One of the men who had seen a man running along the path with something on his face stated that the fleeing man wore a black or blue long-sleeved sweater. The child was able to positively identify Anderson as the man she saw changing clothes on the path and running back minutes later. She also identified the shirt found in Jackson's home as the one she saw Anderson changing into on the path.

Before the case was tried, Anderson agreed to submit to a polygraph test, and stipulated that the results would be admitted at trial. The polygraph examiner testified that in his opinion Anderson was not being truthful when he stated that he did not commit the robberies at issue, did not change clothes on the dirt path, and did not wear a bandanna on his face at the shoe store on the day of the robberies.

A rational trier of fact could have found from the evidence that Anderson was guilty beyond a reasonable doubt of the charged offenses.[3]

2. Anderson complains that the trial court erred in allowing a witness to testify when the state had not included her name on a list of possible witnesses. This argument presents no basis for reversal.

On the first day of trial, the prosecutor stated that he wanted to call as a witness the mother of the child who saw Anderson on the path. The witness' name was not on the witness list, though it was identified on the offense report, which was given to the defense months before trial. The trial court called a recess for the remainder of the day so that defense counsel would have an opportunity to interview the witness.

The next day, the state called the child's mother as a witness. She testified that her daughter told her that she had seen a man change his clothes on the path beside their home. She also testified that she took her daughter to show her where the man lived.

Anderson did not give the state a written discovery request pursuant to OCGA § 17-16-1 et seq. So OCGA § 17-16-3 does not oblige the state to furnish a list of witnesses on its own initiative.[4] Nor did Anderson file a written demand for a list of witnesses. In the absence of a written demand for a witness list, the state was not obligated to supply such a list.[5]

Even if the state had violated its discovery obligations by calling

---

[3] See *Burgest v. State*, 231 Ga. App. 25, 26 (497 SE2d 623) (1998).
[4] See *Hammett v. State*, 246 Ga. App. 287, 289 (2) (539 SE2d 193) (2000).
[5] See id.

a witness whose name was not on the list, the trial court did not err in admitting the testimony. Upon learning of such a violation, the court has discretion to, among other things, permit an interview of the witness.[6] In this case, the trial court allowed defense counsel to interview the witness the day before she testified. And we note that the mother's testimony was cumulative of that provided by the child and was therefore harmless.[7] Under the circumstances, the trial court did not abuse its discretion in admitting the testimony.[8]

3. Anderson claims the identification procedures used at the crime scene and the police station were impermissibly suggestive, and therefore the identifications should have been excluded. We find no basis for reversal.

Anderson did not move to suppress evidence of the identifications below, and made no objection to the identification evidence at trial. Therefore, the issue has not been preserved for review on appeal.[9] In any event, the argument is without merit.

(a) *The shoe store identification.* Although showing suspects singly to a witness for identification purposes is inherently suggestive, an identification need not be excluded as long as under all the circumstances the identification was reliable notwithstanding any suggestive procedure.[10] Our inquiry here is whether, under the totality of the circumstances, there was a substantial likelihood of irreparable misidentification.[11] To evaluate that likelihood, we consider factors that include the witness' opportunity to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.[12]

Applying these factors, we find that the cashier had an excellent opportunity to view Anderson during the robbery. The cashier testified that he saw the robber for approximately two minutes. He was able to describe the robber, the robber's clothes, and the handgun used. He particularly remembered the shape of the robber's face, his cheekbones, and his eyes. The cashier noticed that the robber's hair was combed straight back. He added, "If anyone pulls a gun to you . . . of course you're going to remember the person's exact face." The witness was certain of his identification at the showup which took place within an hour of the armed robberies. In addition, we note

[6] See *Carter v. State*, 253 Ga. App. 795, 797-798 (1) (560 SE2d 697) (2002).
[7] See generally *Mize v. State*, 269 Ga. 646, 653 (7) (501 SE2d 219) (1998).
[8] *Carter*, supra at 798 (1).
[9] See *Pickstock v. State*, 235 Ga. App. 451, 458-459 (5) (b) (509 SE2d 717) (1998).
[10] See *Toney v. State*, 253 Ga. App. 231, 232 (1) (558 SE2d 780) (2002).
[11] Id.
[12] Id.

that the officers presented the witness with two suspects at the time of the identification. It is unlikely that the in-court identification was tainted by the showup. There was no error in admitting the testimony.[13]

(b) *The police station identification.* Nor did the trial court err in allowing evidence of the witnesses' identification at the police station. Officers took Anderson to the police station within an hour after the robberies, and presented him to the store customer and her daughter.

As with the on-the-scene identification discussed above, Anderson did not move to suppress the evidence or object to its admission at trial. Thus, this issue is not subject to appellate review.[14]

But, even if Anderson had properly preserved this issue for appeal, there would be no basis for reversal. A review of the record reveals that the victims testified to their opportunity to view the perpetrator during the robberies and thus established an independent basis to support their identifications.[15] For instance, the store customer testified that she was able to identify the robber because the robber was "directly in [her] face" and she "looked at him good . . . because [she] couldn't do nothing but just look, scared to move." She saw "right up by his eyes and right up in his face." She noticed that he had pock marks on his face, and wore a long-sleeved striped shirt or jersey. When asked at the police station if she was sure about her identification, she replied, "I'm absolutely positive that's the one that put that gun in my chest and pushed me back. . . . It was the same face, it was the same face."

Her daughter "took about a minute to look at him" during the robbery. When she was asked whether Anderson was the man who robbed her, she said, "Yes," noting that there was no doubt in her mind that he was the man. Applying the factors discussed above, there was little likelihood of misidentification in this case. In light of the totality of circumstances and the certainty of the witnesses' identifications, the identifications were not erroneously admitted.[16]

4. Anderson contends the trial court erred in not suppressing evidence seized from Jackson's apartment. Although his argument is unclear, he seems to argue that the officers lacked probable cause to enter the apartment and arrest him and that they did not have valid consent to search the apartment. We disagree.

When we review a trial court's decision on a motion to suppress, the evidence is construed most favorably to uphold the findings and

---

[13] See *Pickstock*, supra at 457 (5) (a).
[14] See id. at 458-459 (5) (b).
[15] See id. at 459 (5) (b).
[16] See *Williams v. State*, 241 Ga. App. 670, 671 (1) (527 SE2d 272) (1999).

judgment of the trial court; the trial court's findings on disputed facts and credibility are adopted unless they are clearly erroneous and will not be disturbed if there is any evidence to support them.[17]

While an officer must generally have a search warrant or consent to enter a home to make an arrest, an officer can enter a home to arrest a suspect when he or she has followed the suspect there in "hot pursuit."[18] A suspect may not defeat an arrest which has been set in motion in a public place by escaping to a private place.[19] "Hot pursuit" need not involve a high speed chase through public streets.[20] Indeed, a warrantless arrest may be authorized based on "hot pursuit" where the defendant stood in the doorway of her house, saw the police, and then retreated inside the house.[21] The key to "hot pursuit" is that the defendant is aware he is being pursued by the police, and is therefore likely to disappear or destroy evidence of his wrongdoing if the officer takes the time to get a warrant. In other words, the "hot pursuit" provides the exigent circumstances necessary to justify the failure to obtain a warrant.[22]

When the officers arrived at Anderson's apartment, they had specific information about the suspect's race, gender, complexion, hairstyle, attire, build, and residence and the car which he used to accomplish the crimes. An officer testified that Anderson (along with Walker) matched the witnesses' descriptions of the suspect, he was in front of apartment 3, the car resembled the one involved in the crimes, and the violent crimes had occurred only moments earlier and a short distance away. The officers had at least an articulable suspicion that Anderson committed the crimes, and therefore had grounds for stopping Anderson to question him.[23] When Anderson started to leave, the officers ordered him to stop, but he refused to stop and instead retreated into the apartment. A person's flight upon seeing a police officer may be some evidence of guilt.[24] And, flight in connection with other circumstances can be sufficient to constitute probable cause for arrest without a warrant.[25] Moreover, in light of the fact that one of the men might have committed three armed robberies just moments earlier, and measuring the police action from the foresight of a rapidly developing situation, there was some evi-

---

[17] *State v. Diamond*, 223 Ga. App. 164, 166 (477 SE2d 320) (1996); see also *State v. David*, 269 Ga. 533, 535 (1) (501 SE2d 494) (1998).

[18] *State v. Nichols*, 225 Ga. App. 609, 610 (1) (a) (484 SE2d 507) (1997).

[19] Id.; see *Jenkins v. State*, 223 Ga. App. 486, 488 (1) (477 SE2d 910) (1996).

[20] *Nichols*, supra.

[21] Id. at 610-611.

[22] Id.

[23] See *Freeman v. State*, 248 Ga. App. 363, 364-365 (1) (548 SE2d 616) (2001).

[24] See *Harris v. State*, 205 Ga. App. 813, 814 (1) (423 SE2d 723) (1992).

[25] Id.

dence to support the court's finding of probable cause and an exigent circumstance.[26]

Regardless of whether the officers had probable cause to arrest Anderson when they initially approached him, after he attempted to retreat into the apartment upon the officers' arrival, there was sufficient evidence to support a finding of probable cause to arrest him.[27] The trial court did not err in finding that the arrest was lawful.

As for the search of the apartment, any person who possesses common authority over premises may consent to a warrantless search of those premises.[28] The apartment lease was in Jackson's name. Although Jackson and Anderson testified that neither gave officers consent to search, the officer testified otherwise. Viewing the evidence in favor of the trial court's ruling, and accepting its findings as to the evidence, we conclude that Jackson had sufficient authority to consent, and did in fact consent, to a search of the apartment.[29]

The trial court did not err in denying the motion to suppress.
*Judgment affirmed. Eldridge and Mikell, JJ., concur.*

DECIDED FEBRUARY 4, 2004.

*John R. Mobley II*, for appellant.
*J. Gray Conger, District Attorney, Julia A. Slater, Assistant District Attorney*, for appellee.

---

[26] See generally *Owens v. State*, 236 Ga. App. 534, 536 (512 SE2d 394) (1999).

[27] See *Freeman*, supra.

[28] *Miners v. State*, 250 Ga. App. 443, 446 (4) (550 SE2d 725) (2001); see *State v. West*, 237 Ga. App. 185 (514 SE2d 257) (1999).

[29] See *Ford v. State*, 214 Ga. App. 284, 285 (1) (447 SE2d 334) (1994) (apartment lessee who allowed brother to stay in her apartment rent-free had sufficient control and authority over bedroom in which he stayed, and could validly consent to a search).