RANDOLPH, Justice,
concurring in part and dissenting in part:
¶ 15. I concur with the Majority’s determination that Issues I, II, III, and V in Frederick Bell’s “Motion for Leave to File Successive Petition for Post-Conviction Relief’ are barred pursuant to Mississippi Code Sections 99-39-5(2) and 99-39-27(9), and are otherwise without merit. See Miss.Code Ann. §§ 99-39-5(2), 99-39-27(9) (Supp.2010). However, I depart from joining my colleagues in granting relief to Bell under Issue IV, as the Majority is permitting itself to be manipulated by Bell’s untimely machinations of the post-conviction-relief process. I would find that the consideration of Issue IV should be barred as a “second or successive application” per Section 99-39-27(9); for, indeed, this Court previously has addressed Bell’s alleged “mental retardation” in his prior petition for post-conviction relief. Bell v. State, 879 So.2d 423, 443 (Miss.2004). This Court then concluded that Bell’s claims “that counsel failed to present mitigating evidence regarding his mental retardation, emotional disturbances and mental illness” were “without merit.” Id. (emphasis added). In the alternative, if this was not a successive application, the consideration of Issue IV should be precluded by expiration of the statute of limitations as established in Mississippi Code Section 99 — 39—5(2)(b), for the petition was untimely presented. See Miss.Code Ann. § 99-39-5(2)(b) (Supp. 2010). Finally, since the Majority elects to enforce selectively the “successive petition” and “limitations” bars on only four of the issues presented, I address the lack of merit in that remaining issue. Bell has failed woefully to present sufficient admissible evidence by expert or otherwise to support this renewed claim of mental retardation. See Miss. R. Evid. 702 (“a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if ... (2) the testimony is the product of reliable principles and methods.... ”); Rebelwood Apartments RP, LP v. English, 48 So.3d 483, 494 (Miss.2010) (“[t]his court has held that an expert’s qualification and reliability of ex *96 pert testimony are separate questions”). Accordingly, I dissent.

FACTS

¶ 16. Bell and his three siblings grew up in a violent, abusive, and unstable home environment. The December 6, 2001, affidavit of Myra Bell, Bell’s mother, provided that Lonnie Bell, Bell’s father, drank heavily and “would beat me and the boys almost every day for no reason at all.” The November 16, 2010, affidavit of Tammy Armstrong, Bell’s ex-girlfriend and the mother of his child, was that Bell “relayed to me that his mother was addicted to drugs.... ” According to Myra Bell, when Bell was seven years old, his father “was sent to prison for killing a man.”[3] Bell and his siblings each failed to complete high school and, according to Myra Bell, three of those children had been in special education. Myra Bell further stated, in December 2001, that each of her three sons was “presently serving time in prison for various crimes.... ”
¶ 17. On May 6,1991, convenience-store clerk Robert C. “Bert” Bell was robbed, shot, and murdered in Grenada County, Mississippi, between 1:00 p.m. and 2:00 p.m. At approximately 11:53 p.m. that evening, drug dealer Tommy White was murdered at a service station in Memphis, Tennessee. Bell was indicted by both states for the separate murders. Bell plea-bargained in Tennessee, and the first-degree murder charge was reduced to second-degree murder, to which he pleaded guilty. Bell elected to contest the murder charge pending in Mississippi. At Bell’s extradition hearing, he claimed that, at the time of the Mississippi murder, he was in Tennessee on business, i.e., “I was in the park in front of my grandma’s house, selling dope.” Following a two-day trial, on January 27, 1993, a jury in the Circuit Court of Grenada County, Mississippi, found Bell guilty of the capital murder of Bert Bell and sentenced him to death. See Bell v. State, 725 So.2d 836, 841 (Miss.1998).

PROCEDURAL HISTORY

¶ 18. Bell has been given numerous opportunities before both state and federal courts to challenge his conviction and sentence. In 1998, this Court affirmed Bell’s conviction and death sentence. See id. at 836. On December 17, 1998, this Court denied Bell’s motion for rehearing. See id. On May 17, 1999, the United States Supreme Court denied Bell’s petition for writ of certiorari, and subsequently denied Bell’s motion for rehearing. See Bell v. Mississippi, 527 U.S. 1054, 120 S.Ct. 16, 144 L.Ed.2d 820 (1999); Bell v. Mississippi, 526 U.S. 1122, 119 S.Ct. 1777, 143 L.Ed.2d 805 (1999).
¶ 19. On August 4, 1999, within the time provided by the statute of limitations, Bell filed a “Pro Se Petition for Post-Conviction Relief,” along with a “Pro Se Motion for Appointment of Qualified Counsel and Stay of Execution.” On December 20, 2001, Bell filed his “Application for Leave to File Petition for Post-Conviction Collateral Relief’ and his “Petition for Post-Conviction Collateral Relief Incorporating Memorandum of Law.” Within that petition, Bell contended that the “failure to adequately investigate and to present psychological mitigating evidence during the penalty phase of a trial” regarding a client’s mental impairment “renders an attorney’s assistance ineffective.” Bell asserted constitutionally ineffective assistance of counsel because “[cjounsel failed to investigate and present mitigating evi *97 dence concerning [Bell’s] mental retardation.” (Emphasis added.) In support of this contention, Bell stated that, based upon his attached “Pupil Personal Data Sheet” and “Assessment' Team Report,” prepared by the State Department of Education in November 1987, he “has a full scale IQ of 81[4] and a significant disability in the area of reading and math.” According to Bell’s petition, “[e]ven if there were some dispute over whether [Bell] were actually mentally retarded,, he was clearly of diminished IQ.” (Emphasis added.)
¶ 20. On May 20, 2004, this Court denied Bell’s “Application for Leave to File Petition for Post-Conviction Collateral Relief’ and “Pro Se Petition for Post-Conviction Relief.”[5] See Bell, 879 So.2d at 423. This Court specifically found that Bell’s claims “that counsel failed to present mitigating evidence regarding his ... mental retardation, emotional disturbances and mental illness” were “without merit.” Id. at 443 (emphasis added). Now-Presiding Justice Carlson, writing for the Court, found that:
[attached to the application is an assessment by the State Department of Education from 1987, which indicated that Bell “functioned in the low average range of intelligence” and had an I.Q. of 81. Aside from the affidavits provided by his mother and sister, Bell’s application provides no evidence that he suffers from either emotional or mental problems. The testimony of Myra Bell primarily focused on the disadvantaged and abusive childhood that Bell suffered.
Id. at 444. On May 28, 2004, Bell filed a “Motion for Enlargement of Time Within Which to File Motion for Rehearing,” asserting that the Mississippi Office of Capital Posl^Conviction Counsel “is now in the process of preparation for evidentiary litigation on several matters which were granted limited evidentiary hearings under Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002).” However, when Bell subsequently filed his “Motion for Rehearing,” neither an Atkins nor a Chase claim was presented.[6] On August 19, 2004, this Court denied Bell’s motion for rehearing. See Bell, 879 So.2d at 423. On February 22, 2005, the United States Supreme Court again denied Bell a writ of certiorari. See Bell v. Mississippi, 543 U.S. 1155, 125 S.Ct. 1301, 161 L.Ed.2d 122 (2005).
¶ 21. On December 1, 2006, the United States District Court for the Northern District of Mississippi, Western Division, Judge Neal Biggers presiding, adjudicated an order denying Bell’s “Motion to Amend Petition for Writ of Habeas Corpus to Raise Claim Under Atkins v. Virginia” as not only “unexhausted” and “untimely,” but also, contrary to the Majority’s assertion otherwise, “lacking in merit-”[7] (Maj. Op. at ¶ 10). In his *98 filings with that court, and despite his December 2001 and May 2004 filings before this Court, Bell maintained that he first became aware of an Atkins claim upon the receipt of his school records on August 24, 2006.[8] The federal district court’s Order first found that Bell “has failed to present this claim in state court and thereby exhaust his available state remedies before seeking federal habeas relief.” (Emphasis added.) Nonetheless, Judge Biggers addressed the merits of Bell’s motion and determined that:
[t]he affidavits, reports, and records attached by [Bell] ... demonstrate [Bell’s] full-scale I.Q. is considerably higher than the threshold for a finding of mental retardation, that his adaptive skills are not significantly limited, that [Bell’s] performance on tests conducted since his incarceration has been suggestive of malingering, and that [Bell’s] poor school performance and poor test scores are a reflection of his specific learning disability and not an indication of the presence of mental retardation. Rather than support a claim of mental retardation, this Court is of the opinion that [Bell’s] proof discounts such a claim.
In October 2007, Bell filed a “Reply Brief in Support of His Petition for Writ of Habeas Corpus Under 28 U.S.C. Section 2254 by a Person in State Custody Under Sentence of Death” in the federal district court.[9] Notably, Bell argued to the federal district court that “[t]he documents previously presented by [Bell] clearly indicate that [he] is extremely mentally challenged, even if he does not meet the legal definition of retardation.” (Emphasis added.) On June 20, 2008,[10] the federal district court denied Bell’s petition for federal ha-beas relief. See Bell v. Epps, 2008 WL 2690311 (N.D.Miss. June 20, 2008). That court found that Bell’s “schools records, a psychological report, and various reports and forms related to [Bell’s] requests for Social Security Income ... and disability benefits[,]” presented insufficient “evidence of ... significant limitations in intellectual and adaptive functioning” and could not support Bell’s claim that “counsel’s failure to present evidence of [Bell’s] allegedly significant mental limitations rendered counsel’s performance ineffective.” Id. at **42, 44. On August 13, 2008, the federal district court granted Bell a Certificate of Appealability (“COA”) “with regard to the narrow issues of whether trial counsel rendered ineffective assistance in investigating and presenting evidence during the guilt and sentencing portions of *99 trial.” Bell v. Epps, 2008 WL 3828766 at *6 (N.D.Miss. Aug.13, 2008). On September 28, 2009, the Fifth Circuit Court of Appeals affirmed the denial of federal ha-beas relief on those issues “on which the district court granted a COA.” Bell v. Epps, 347 Fed.Appx. 73, 80 (5th Cir.2009). On November 29, 2010, for the third time, the United States Supreme Court denied relief to Bell. See Bell v. Epps, — U.S. -, 131 S.Ct. 645, 178 L.Ed.2d 487 (2010).

ANALYSIS

(1) Successive

¶22. In December 2001, Bell filed a “Petition for Post-Conviction Collateral Relief’ which specifically asserted a constitutional ineffective-assistance-of-counsel claim for failure to investigate and present mitigating evidence regarding alleged mental retardation. Attached to his petition were the State Department of Education records from November 1987 which provided that Bell had a verbal IQ of 82, a performance IQ of 84, and a full-scale IQ of 81. On May 20, 2004, this Court found that Bell’s claims “that counsel failed to present mitigating evidence regarding his ... mental retardation, emotional disturbances and mental illness,” were “without merit[,]” and that there was a lack of evidence that Bell “suffers from either emotional or mental problems.” Bell, 879 So.2d at 443^4.
¶ 23. The foundation for an Atkins claim is mental retardation. See Atkins, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002). This Court previously has adjudicated that the claim of mental retardation is “without merit.”[11] Id. at 443. Accordingly, the denial of Bell’s application claiming mental retardation constitutes “a bar to a second or successive application under this article.” Miss.Code Ann. § 99-39-27(9) (Supp.2010). This basis, standing alone, dictates a denial of Bell’s mental-retardation claim.

(2) Untimely

¶ 24. The second flaw in considering Bell’s petition is that it is untimely. This Court summarily declares that “the issue of Bell’s mental retardation is not procedurally barred.” (Maj. Op. at ¶ 8). Yet, as the State argues, Section 99 — 39—5(2)(b) provides a one-year statute of limitations for capital cases. See Miss.Code Ann. § 99-39-5(2)(b) (Supp.2010). No plea to avoid a one-year limitation has been advanced, and no claim has been presented that filings by Bell negate application of the statute.[12] If we ignore all plausible expiration dates for the statute of limitations and look only to the December 1, 2006, order of the federal district court, no fair-minded jurist could argue that Bell was not clearly and unequivocally placed on notice that a claim of mental retardation must be raised in state court.[13] Nonetheless, instead of following the December 2006 instruction of the federal district court to proceed in a state court with an Atkins claim, available to Bell since June *100 20, 2002,[14] without a showing of cause or extraordinary circumstance, Bell has delayed all these years before filing his present “Motion for Leave to File Successive Petition for Post-Conviction Relief.” (Emphasis added.) For all these years, no Mississippi state court has received a plea from Bell to be heard again on alleged mental retardation, not a new issue. Bell undeniably has been accorded due process not only regarding mental retardation, but on every other issue timely filed, save none. See Smith v. State, 477 So.2d 191, 195 (Miss.1985) (due process requires a meaningful opportunity to be heard). For purposes of this opinion only and not deciding the earliest date the limitation expired, relying on the record before us and using one of the last possible events, either Bell’s claimed receipt of records in August 2006 or the federal district court’s order denying Bell’s “Motion to Amend Petition for Writ of Habeas Corpus” in December 2006,[15] each provided unequivocal notice to Bell of a duty to again raise the issue in state court. Using either date, the result is the same; the statute of limitations expired before Bell filed his “Motion for Leave to File Successive Petition for Post-Conviction Relief’ in November 2010.
¶ 25. While perfection in PCR petition filings has never been required, Bell’s lack of any diligence, much less due diligence, is inexcusable. Likewise, the failure of the Court to enforce a statute of limitations, substantively created by the Legislature, is no more excusable. See Cole v. State, 608 So.2d 1313, 1317-18 (Miss.1992) (“[t]he establishment of these time boundaries is a legislative prerogative. That body has the right to fix reasonable periods within which an action shall be brought and, within its sound discretion, determine the limitation period.”). The statute of limitations is substantive law, not to be confused with procedural issues. The Court, without authority of law (constitutional or otherwise), is impeding the finality of determination by overstepping its constitutional authority, while granting special dispensation for Bell, a disposition with which I strongly disagree and reject.[16] See id. at 1318 (“[i]t should not be the province or function of this court to intrude upon an area peculiarly within the channel of legislative ac *101 tion”). We are a nation and state of laws, not men.
¶ 26. Acknowledgment, acceptance, and enforcement of finality of determination established in a statute of limitations is consistent with federal law. United States Code Section 2244(d)(1) addresses the “finality of determination” and provides, in pertinent part, that:
(d)(1) A 1-njear period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of—
[[Image here]]
(C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
(D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.
28 U.S.C. § 2244(d)(1) (1996) (emphasis added). See also Mathis v. Thaler, 616 F.3d 461, 470 n. 9 (5th Cir.2010) (citing 141 Cong. Rec. S7803-05, S7877 (1995)) (noting that “Congress determined that a one-year limitations period was reasonable for federal habeas petitioners[,]” in the interest of “curbing] abuse of the writ of habeas corpus .... ”); Beaty v. Schriro, 554 F.3d 780, 785 (9th Cir.2009) (Beaty failed to “raise an Atkins claim within one year of the Court’s decision in Atkins, as required by the AEDPA. 28 U.S.C. 2244(d)(1)(C). His Atkins claim is therefore barred.”); In re Lewis, 484 F.3d 793, 796 (5th Cir.2007) (“[t]he Supreme Court issued Atkins on June 20, 2002; thus, the one-year limitations period for filing a habeas application based on Atkins expired on June 20, 2003.”). Can a federal petitioner escape the one-year window? Yes, but only upon a showing of diligence and extraordinary circumstances. See Holland v. Florida, — U.S. -, 130 S.Ct. 2549, 2562, 177 L.Ed.2d 130 (2010) (quoting Pace v. DiGuglielmo, 544 U.S. 408, 418, 125 S.Ct. 1807, 161 L.Ed.2d 669 (2005)) (a habeas petitioner can establish that he is entitled to equitable tolling only if “ ‘(1) ... he ha[d] been pursuing his rights diligently, and (2) ... some extraordinary circumstance stood in his way and prevented timely filing.”) (emphasis added). Today’s case offers neither.
¶ 27. Were we to assume arguendo that equitable tolling should be considered in all death penalty cases, Bell’s delay of years cannot by any stretch of the imagination be deemed diligent. See Mathis, 616 F.3d at 474 (quoting In re Wilson, 442 F.3d 872, 875 (5th Cir.2006)) (“[ejquity is not intended for those who sleep on their rights.”). Bell has offered no excuse or explanation to justify this delay. Likewise, Bell makes no claim that his case is rare and exceptional. See Mathis, 616 F.3d at 475 (quoting In re Wilson, 442 F.3d at 875) (“[t]he doctrine of equitable tolling is applied restrictively and ... is entertained only in cases presenting ‘rare and exceptional circumstances where it is necessary to preserve a plaintiffs claims when strict application of the statute of limitations would be inequitable.’ ”). Thus, his petition should be dismissed.
¶ 28. In the capital context, where post-conviction proceedings routinely have spanned decades, not years,[17] some parameters for asserting an intervening decision must be imposed. To do otherwise creates *102 a sanction of unlimited and endless filings for an infinite period, controlled by when the petitioner can gain a strategic advantage to thwart the administration of justice and finality of sentence. By not enforcing a time requirement, the Court defies the will of the people as established through acts of the Legislature to prevent such abuse and “gaming” of the judicial system. See Atkins, 536 U.S. at 353, 122 S.Ct. 2242 (Scalia, J., dissenting) (criticizing the Atkins holding for “turning the process of capital trial into a game. One need only read the definitions of mental retardation adopted by the American Association on Mental Retardation and the American Psychiatric Association ... to realize that the symptoms of this condition can readily be feigned.”) Today’s decision shall only encourage death penalty litigators to file an endless number of pleadings, many at the “twelfth hour,” to insulate their client from facing the certainty of the judgment of a jury that imposed death and the appellate tribunals that repeatedly have declared that such conviction and sentence was fair and just. This approach ignores the sound principle that such post-conviction-relief issues could, and should, have been raised years or decades earlier. Such approach not only adds years to the appeal process, it thwarts the fair and equal administration of justice, eschews legislative action, imposes unnecessary and unwarranted additional duties on our overworked circuit courts, and, finally, violates our constitutional authority. See Cole, 608 So.2d at 1318 (“[i]t should not be the province or function of this court to intrude upon an area peculiarly within the channel of legislative action”). Bell has had a full measure of due process and ample notice of the necessity of timely raising mental retardation, therefore, equitable tolling is inappo-site. Bell has had numerous opportunities to exhaust not only his Atkins claim, but also all other claims, in state court. “[I]t appears that [Bell] is engaging in ‘needless piecemeal litigation[, or] ... collateral proceedings whose only purpose is to vex, harass, or delay.’ ” Beaty, 554 F.3d at 785 n. 3 (quoting Sanders v. United States, 373 U.S. 1, 18, 83 S.Ct. 1068, 10 L.Ed.2d 148 (1963)). Accordingly, Bell’s assertion of this issue at present, filed nearly contemporaneously with the State filing its “Motion to Reset Execution Date,” should be dismissed as untimely.

(3) Insufficient evidence

¶ 29. Finally, this Court has stated that “[t]here must at least appear to be some basis for the truth of the claim before the [procedural bar] will be waived.” Means v. State, 43 So.3d 438, 442 (Miss.2010) (quoting Crosby v. State, 16 So.3d 74, 79 (Miss.Ct.App.2009)). Bell has equivocated on the legitimacy of his claim of mental retardation in prior filings. His December 20, 2001, petition stated that “[e]ven if there were some dispute over whether [Bell] were actually mentally retarded, he was clearly of diminished IQ.” His reply brief filed in the federal district court in October 2007 provided, “[t]he documents previously presented by [Bell] clearly indicate that [he] is extremely mentally challenged, even if he does not meet the legal definition of retardation.” Furthermore, Bell’s guilty plea in Tennessee, while not included in the record, necessarily must have included a competency determination. As Bell’s conviction based upon that guilty plea is included in the record, and “judicial records impart absolute verity[,]” it begs the question of the legitimacy of Bell’s renewed assertion of mental retardation. Cole, 608 So.2d at 1321.
¶ 30. The purportedly “sufficient evidence” relied upon by the Majority in granting Bell relief is a November 18, 2010 *103 affidavit of Dr. Marc Zimmerman.[18] This Court and the federal district court previously have addressed the lack of merit in Bell’s mental retardation claim. See supra ¶¶ 20-21. Yet the Court, presented with Dr. Zimmerman’s affidavit, which is predicated upon a dubiously suspect theory, which Dr. Zimmerman admits is not accepted in his and others’ clinical practice (i.e., the “Flynn Effect”), opines that Bell should be permitted “to proceed on the issues of mental retardation” in the circuit court, despite Dr. Zimmerman never having met, interviewed, or tested Bell; never having retrieved the “raw data” from independent IQ tests performed on Bell in 1987 and 1993; and, as pointed out in Justice Chandler’s separate opinion, failing to address the “adaptive functioning” prong outlined in Atkins.
¶ 31. Dr. Zimmerman acknowledges that in 1987, at age 16, a “school assessment team found [Bell] to have a full scale IQ of 81.[19] The team found that there was a [ninety] percent chance that [Bell’s] IQ fell between the range of 76-86.” The 1987 report concluded that Bell was “functioning in the low average range of intelligence!,]” and that his “primary handicapping condition” was “a specific learning disability in the area of basic reading.” Dr. Zimmerman further concedes that in 1993, at age 21 (just eighteen days before trial), Bell was seeking Social Security benefits (while incarcerated for the two murders) and was evaluated by the Social Security Administration for disability benefits. According to Dr. Zimmerman, Bell “received a full scale IQ score of 61[,]” but “[t]he examiner believed [Bell] to be malingering, and stated that he believed [Bell’s] level of intellectual abilities to be characterized by scores near 80.” That 1993 report provided:
[a]t the very worst, [Bell] should be considered as having intellectual abilities in the upper limits of the borderline range. If he is released from prison, he is going to be handicapped by his inability to read a little. However, he does have sufficient math skills to be of use to him in an employment setting if he were motivated and well trained. He has no difficulty following instructions. He communicates adequately in terms of expressing himself. No deficits are noted at all in terms of his capacity to understand simple directions and perform simple tasks. He is probably competent to manage benefits should any be awarded.
A related form completed by a reviewer with a Ph.D. noted that there was no evidence that Bell suffered from mental retardation or psychotic disorders, then added that “[c]laimant’s adaptive functioning appears to [be] adequate, i.e., he has a girlfriend and son, a valid [driver’s license], and previous experience cutting hair. He seems only limited by his reading skills. No signs or symptoms suggestive of mental/emotional disturbance detected .... ” Finally, on January 22,1993, a vocational examiner with the Mississippi Department of Rehabilitation Services completed a “Vocational Analysis Work *104 sheet” regarding Bell, which provided that “[tjhough this claimant has reading deficiencies, he can follow simple instructions, express himself, perform simple tasks, and interact appropriately with others if he desires.”
¶ 32. In Spicer v. State, 973 So.2d 184 (Miss.2007), this Court concluded that Spi-cer was not entitled to an Atkins hearing because “Dr. Zimmerman’s affidavit did not discuss whether Spicer was malingering and does not fulfill the requirements of Chase.” Spicer, 973 So.2d at 211. This despite that Dr. Zimmerman’s affidavit in that case stated:
that he met with Spicer and conducted the Wechsler Adult Intelligence Scale III ..., Screening Tests for Luria-Nebraska Neurological Battery, Short Category Test, Benton Visual Retention test, Wide Range Achievement Test 3, and the “Minnesota Multiphasic Personality Inventory 2.” Dr. Zimmerman concluded from the test results that Spicer has a full-scale IQ of 75, that Spicer likely suffers from depression and probably bipolar disorder. Dr. Zimmerman also stated that, based on his findings, he was able to conclude that Spicer functions in the mildly-retarded-to-borderline range of intellectual ability.
Id. at 209-10 (emphasis added). In the case sub judice, Dr. Zimmerman has neither met Bell, tested Bell, nor retrieved the “raw data” from the 1987 and 1993 tests, which Dr. Zimmerman acknowledges makes it “impossible to determine if the tests were properly scored.” But presented with Dr. Zimmerman’s affidavit that only briefly refers to malingering (“I see no indication in the [Social Security Administration] records that the examiner tested for malingering”); and opines “to a reasonable degree of psychological certainty that [Bell] has a combined intelligence quotient of 75 or below” despite Dr. Zimmerman never having met Bell, tested Bell, or retrieved the “raw data” from Bell’s 1987 and 1993 tests, and failing to rely on accepted scientific principle; this Court concludes that Bell is entitled to an Atkins hearing.
¶ 33. The underlying basis for Dr. Zimmerman’s affidavit is to apply a theory known as the “Flynn Effect,”[20] which “posits that, over time, the IQ scores of a population rise without corresponding increases in intelligence and thus the test must be re-normalized over time.”[21] In re Mathis, 483 F.3d 395, 398 n. 1 (5th Cir.2007). Dr. Zimmerman, incorporating this theory, then opines that the Wechsler Intelligence Scale for Children — Revised, given to Bell in 1987, “was normalized in 1974, and thus, a total of 4.29 points should be deducted from the full scale IQ of 81 which [Bell] received in 1987, thereby making his Flynn adjusted full scale IQ 76.71.” (Emphasis added.) But taking either Bell’s 1987 full-scale IQ score of 81[22] or accepting Dr. Zimmerman’s capital-crime calculated number, neither qualifies Bell for Eighth Amendment Atkins protection. In Chase, this Court stated that “defendants with an IQ of 76 or above do not qualify for Eighth Amendment Atkins *105 protection.” Chase, 873 So.2d at 1029 n. 20 (emphasis added). Moreover, among the states that have defined the concept of “subaverage intellectual functioning,” the overwhelming majority have reached a consensus that it constitutes either an IQ of 70 or below or two or more standard deviations below the mean.[23] See Ariz. Rev.Stat. § 13-753(K)(5) (“mental retardation” includes a full-scale IQ of 70 or below, “tak[ing] into account the margin of error for the test administered.”); Conn. Gen.Stat. § l-lg(b); DeLCode Ann., tit. 11, § 4209(d)(3)(d)(2); Fla. Stat. Ann. § 921.137(1); Idaho Code § 19-2515A(l)(b); Kan. Stat. Ann. §§ 21-4623(e) & 76-12b01(i); Ky.Rev.Stat. 532.130(2); Md.Code Ann., Crim. Law, § 2-202(b)(l)(i); Neb.Rev.Stat. § 28-105.01(3) (IQ of 70 or below presumptive evidence of mental retardation); N.C. Gen. Stat. § 15A-2005(a)(l)(c); S.D. Codified Laws § 23A-27A-26.2 (IQ exceeding 70 presumptive evidence of absence of mental retardation); Tenn.Code Ann. § 39-13-203(a)(1); Va.Code Ann. . § 19.2-264.3:1.1(A); Wash. Rev.Code § 10.95.030(2)(c); Myers v. State, 133 P.3d 312, 335 (Okla.Crim.App.2006); Ex parte Briseno, 135 S.W.3d 1, 7 (Tex.Crim.App.2004); Head v. Stripling, 277 Ga. 403, 404, 590 S.E.2d 122, 124 (2003); State v. Lott, 97 Ohio St.3d 303, 779 N.E.2d 1011, 1014 (2002) (rebuttable presumption of no mental retardation if IQ above 70); Perkins v. State, 851 So.2d 453, 456 (Ala.2002). Arkansas has a statutorily created, rebutta-ble presumption of mental retardation if an individual has an IQ of 65 or below. See Ark.Code Ann. § 5-4-618(a)(2). Thus, among the states defining “subaverage intellectual functioning,” only Illinois also utilizes an IQ of 75 or below as presumptive evidence of mental retardation. See Ill. Comp. Stat., ch. 725, § 5/114-15(d). As stated in Chase, quoting Atkins, “the enactments of the various legislatures are the ‘clearest and most reliable objective evidence of contemporary values.’ ” Chase, 873 So.2d at 1024 (quoting Atkins, 536 U.S. at 312, 122 S.Ct. 2242). Furthermore, as stated in Chase, the Mississippi Legislature has the prerogative to enact legislation “set[ting] forth the definition of mental retardation to be applied in” this State. Chase, 873 So.2d at 1027. Given the near consensus among other jurisdictions of defining “subaverage intellectual functioning” as approximately an IQ of 70 or below, perhaps it is now time for the Mississippi Legislature to set forth a specific definition of mental retardation which includes such general IQ parameters.
¶ 34. Furthermore, the scientific validity of the “Flynn Effect,” utilized by Dr. Zimmerman, repeatedly has been rejected by the Fifth Circuit Court of Appeals. See id. (citing In re Salazar, 443 F.3d 430, 433 n. 1 (5th Cir.2006)). In Ledford v. Head, 2008 WL 754486 (N.D.Ga. Mar. 19, 2008), a federal district court stated the following regarding Dr. Zimmerman’s utilization of the “Flynn Effect” during an evidentiary hearing on a petition for writ of federal habeas corpus:
[t]he Court was not impressed by the evidence concerning the Flynn effect. *106 There was testimony at the hearing that the Flynn effect is a “generally recognized phenomenon,” but experts for both petitioner and respondent agreed that it is not used in clinical practice to reduce IQ scores. Both Dr. King and Dr. Zimmerman testified that they have never seen it utilized except in capital cases.[24] Dr. Zimmerman specifically stated: “I don’t think I’ve seen anybody who is doing this in clinical practice.” ... The Court is hesitant to apply a theory that is used solely for the purpose of lowering IQ scores in a death penalty context.
Id. at *7 (emphasis added).
¶ 35. Thus, Dr. Zimmerman’s hypothesis, predicated upon a suspect theory, admittedly not used by him in clinical practice and only “for the purpose of lowering IQ scores in a death penalty context[,]” hardly constitutes an opinion which is “the product of reliable principles and methods....” Id.; Miss. R. Evid. 702. The acceptance of such a fallacious, inadmissible opinion should be rejected as a “reasonable basis” for granting Bell an evidentiary hearing on the mental-retardation issue. Chase, 873 So.2d at 1029.
¶ 36. Accordingly, I respectfully concur in part and dissent in part.
CHANDLER AND PIERCE, JJ., JOIN THIS OPINION IN PART.
CHANDLER, Justice,

. Myra Bell added that, following Lonnie Bell’s release, he also "served time for drugs and aggravated assault and some kind of gun charge.”

. The "Assessment Team Report” provided that Bell had a verbal IQ of 82, a performance IQ of 84, and a full-scale IQ of 81.

. On the same day, this Court issued its opinion in Chase v. State, 873 So.2d 1013 (Miss.2004).

. In Bell’s "Motion for Rehearing,” he did contend that:
[t]his Court, in its decision at ¶¶ 78 and 79 recites the general testimony adduced by [Bell], his mother and sister. The recitation states in general the home life of [Bell], his youth, his minimal intellect and lack of education, the poverty he faced, the abuse he suffered and witnessed, and the factor that he might have only been an accomplice in the crime. This recitation is absolutely correct so far as it goes; however, the ineffectiveness of counsel is demonstrably spotlighted by such a recitation.
Notably, Bell asserted only "minimal intellect,” not mental retardation.

."A federal court may not grant federal ha-beas relief on an unexhausted claim, but relief may be denied on an unexhausted claim." See *98 Hughes v. Epps, 694 F.Supp.2d 533, 539 (N.D.Miss.2010) (emphasis added). See also 28 U.S.C. § 2254(b)(2) (1996) ("[a]n application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.”).

.The federal district court rejected this assertion and concluded that it was '‘unpersuaded the discovery of the factual predicates giving rise to the claim constitutes an exception to the one-year limitations period [of 28 U.S.C. § 2244(d)(1)(D) ], as no explanation is offered for why [Bell’s] school records and evaluation reports were not sought and obtained earlier.” The veracity of Bell's claim to the federal district court that such records were not obtained until August 2006 and that he first became aware of an Atkins claim thereafter is suspect, for Bell provided his State Department of Education records from 1987 to this Court on December 20, 2001, nearly five years before August 2006, and advised this Court in May 2004 of an awareness of Atkins. See Bell, 879 So.2d at 444; Atkins, 536 U.S. at 304, 122 S.Ct. 2242.

. This pleading also was filed in this Court.

. On January 1, 2008, Bell’s present counsel began serving as the Director of the Mississippi Office of Capital Post-Conviction Counsel. During the course of this case, in state and federal court, Bell has received the services of at least eight attorneys.

. This is consistent with the finding of the federal district court. See supra ¶ 21.

. Bell has pleaded only that “this Court should overlook any procedural bars” because "the claims in his petition are based on fundamental constitutional rights_" (Emphasis added.)

.Even Bell’s "Motion for Leave to File Successive Petition for Post-Conviction Relief” acknowledges that he "tried to raise his Atkins claim in federal habeas proceedings, but the district court denied him leave to amend his petition to include his claim because it had not yet been presented to this Court." (Emphasis added.)

. Similarly, a Chase claim has been available to Bell since May 20, 2004. See Chase, 873 So.2d at 1013.

. Both dates are well-subsequent- to the alleged intervening decisions of Atkins (June 20, 2002) and Chase (May 20, 2004). See Chase, 873 So.2d at 1013; Atkins, 536 U.S. at 304, 122 S.Ct. 2242. It also could be fairly argued that Bell received ample notice by either one year post-Atkins (June 20, 2003) or one year post-Chase (May 20, 2005). Notably, this Court's 2004 opinion was rendered nearly two years after Atkins announced that the execution of the mentally retarded was prohibited. See Bell, 879 So.2d at 423. Moreover, Bell’s "Motion for Rehearing," despite the issuance of Chase and counsel's previously-noted awareness of Atkins, failed to offer either case for purposes of arguing that Bell was entitled to an evidentiary hearing on mental retardation.

.Moreover, even if one were to argue that the statute of limitations is a mere procedural bar, this Court has stated only that "[ejrrors affecting fundamental constitutional rights are excepted from the procedural bars of the UP-CCRA." Rowland v. State, 42 So.3d 503, 508 (Miss.2010) (emphasis added). What court error has been committed that requires correction? None. The only error to be identified is Bell’s failure to present this issue in the proper forum, in a timely manner. Furthermore, if the Court does take the position that an error affecting a fundamental constitutional right is implicated, which must be "excepted from the procedural bars of the UP-CCRA[,]” then why are Bell's present claims regarding ineffective assistance of counsel deemed procedurally barred by the Court? Id. Indeed, Bell argues, all "claims in his petition are based on fundamental constitutional rights, and therefore are excepted from the procedural bars found in the [UPCCRA].”

. At present, nearly eighteen years have passed since Bell’s conviction and sentence, and nearly twenty years since his victim was murdered.

. Among the numerous affidavits filed in support of Bell’s "Motion for Leave to File Successive Petition for Post-Conviction Relief,” outside of Dr. Zimmerman's affidavit, there is no evidence of mental retardation. In fact, the June 2, 2006, affidavit of Cindy Arnold, Bell’s aunt, specifically struck out a reference to her ability to provide testimony regarding Bell’s "developmental problems." At most, the June 1, 2006, affidavit of Myra Bell, Bell’s mother, alludes to Bell’s "developmental problems,” while in a November 16, 2010, affidavit, she refers to a history of mental illness in the family and that one of Lonnie Bell's sisters is mentally retarded.

. As noted previously, the 1987 "Assessment Team Report” provided that Bell had a verbal IQ of 82, a performance IQ of 84, and a full-scale IQ of 81.

. The "Flynn Effect” is a theory advanced by a political scientist who, under the Mississippi Rules of Evidence, could not be qualified as an expert on mental retardation by "knowledge, skill, experience, training, or education. ...” Miss. R. Evid. 702.

. Dr. Zimmerman’s affidavit provides that “[t]o compensate for aging norms IQ obtained from an intelligence test should be reduced by .33 per year for each year since the test was normalized.”

.As previously noted, this figure was obtained prior to Bell reaching the age of eighteen. See Chase, 873 So.2d at 1023 ("[w]e agree that the failure to provide evidence that mental retardation manifested prior to age of eighteen would be fatal to Chase’s Motion to Vacate Death Penalty.”).

. "The two definitions are essentially the same because the mean IQ is 100 and a standard deviation is fifteen on the Wechsler Adult Intelligence Scale (3rd ed.) (WAIS-II) and sixteen on the Stanford-Binet Intelligence Scale (4th. ed.), the two norms that are now most frequently used to assess a person’s IQ.” Bowling v. Commonwealth of Ky., 163 S.W.3d 361, 374 (Ky.2005). See also State v. Dunn, 41 So.3d 454, 462 (La.2010) ("a person scoring two standard deviations below the mean would have an I.Q. of 70 on the Wech-sler scale and an I.Q. of 68 using the Stanford-Binet scale.”). In effect, "95% of all test-takers will score between 70 and 130, thus those scoring below two standard deviations below the mean are in the bottom 2.5%.” Walker v. True, 399 F.3d 315, 322 n. 6 (4th Cir.2005).

. Notably, Dr. Zimmerman's affidavit provides that he has been qualified as an expert witness in the field of psychology in multiple jurisdictions, but does not mention the United States District Court for the Northern District of Georgia.